UNITED STATES of America, Plaintiff,

v.

Angela TRAVIS, Defendant.

Crim. A. No. 92–50.

United States District Court,
E.D. Kentucky,
Covington Division.

Nov. 23, 1993.

Fred A. Stine, V, Asst. U.S. Atty., Covington, KY, for plaintiff.

Steven N. Howe, Fossett Howe Wessels & Ogle, Ft. Wright, KY, for defendant.

*OPINION AND ORDER*

BERTELSMAN, Chief Judge:

## I. INTRODUCTION

The objections to the Report and Recommendation of the Magistrate Judge's denial of a motion to suppress an airport search require this court once again to struggle with the problem of race as a factor in airport encounters by law enforcement officers with suspected drug couriers.

The motion to suppress was before the Magistrate Judge twice. The first time, the defense did not have available the evidence to raise the issue of racial discrimination. After the Magistrate Judge recommended denying the suppression motion, defendant moved to reopen the record to attempt to show racial discrimination which would vitiate the search and arrest of the defendant. This motion was granted and, after a further evidentiary hearing, the Magistrate Judge again recommended denying the motion to suppress. Objections were timely filed and the matter is now before this court.

## II. FACTUAL BACKGROUND

### A. The Encounter and Search

The officers' approach and arrest of the defendant was itself rather routine. However, for the first time in any case of which we are aware, the parties presented "statistics" concerning the factor of race in airport contacts.

The initial Report and Recommendation well describes the details of the incident involving the surveillance and stop of defendant at the Greater Cincinnati/Northern Kentucky International Airport (Airport) on August 11, 1992:

"Delta flight 1026 from Los Angeles arrives daily at the Greater Cincinnati Airport in the early morning hours and has been the source of numerous drug arrests. Shortly before the flight's arrival on August 11, 1992, Airport Detective Mike Evans routinely examined the passenger list to review the names of those passengers connecting to other cities known for drug distribution, such as Cleveland, Hartford, Ft. Wayne or New York. Based on previous drug cases and arrests, he was focusing specifically on the Cleveland connecting passengers. In doing so, Detective Evans came across the name of Angel Chavez, which name piqued the officer's interest.

"According to Detective Evans, the name Chavez was as common to him as the name Smith or Jones, but he thought the name of Angel to be unusual. This officer agreed that in most instances the first names on a passenger list are not printed in full. The fact that the name Angel could have been in actuality 'Angela' never occurred to Detective Evans.

"The flight history and itinerary of Chavez showed that Chavez purchased a one-way ticket from Los Angeles to Cleveland approximately five hours prior to flight departure. This ticket was purchased through the Inglewood Travel Agency by check, and Evans knew that airline tickets involved in past drug cases had been run through this same travel agency. The officer attached significance to the profile facts that the ticket was purchased five hours before flight and was a one-way ticket.

"When Delta flight 1026 arrived, Detective Evans looked for an Hispanic female as the passengers deplaned at gate 20, but he qualified that testimony by stating that, until a person deplanes, he has no idea what race or color they will be. Evans was assisted by Task Force Officers Jones and Parker. Having seen no Hispanic females deplane the Los Angeles flight, and conceding that he did not see the defendant deplane at all, Evans proceeded to gate 24 where the Cleveland flight was scheduled to board. About thirty minutes had elapsed.

"With the flight itinerary in hand and using a process of elimination, Evans attempted to locate Angel Chavez. Since he was looking for one female passenger, Evans eliminated a couple traveling together, as well as all males and narrowed it down to two people, a Gail Jordan and Angel Chavez. Both were black females. As he surveyed the Cleveland boarding gate area, Evans approached Ms. Jordan, who had just taken a seat after making a telephone call. Once he determined that her name was in fact Gail Jordan and she was traveling round-trip, he terminated the interview and walked over to the other officers to advise them that this particular woman was not Angel Chavez. Evans did not recall seeing any white women at gate 20, and denied that his interest in Chavez was due to her Hispanic surname. Evans pointed to other Hispanic surnames on the passenger list, Diaz and Del Negro, noting that he did not request further flight information on either passenger.

"Detective Evans approached the remaining woman, sat down next to her, and exhibited his badge while identifying himself as a police officer. In the meantime, Detective Parker sat down behind this woman who was unaware of his presence. The woman agreed to speak with Evans and, upon request, produced an airline ticket in the name of Angela Chavez.

"Detective Evans then asked the defendant whether her real name was Angela Chavez, and she answered that the travel agency had spelled her name incorrectly. Upon request, the defendant provided Evans with an Ohio operator's license in the name of Angela Travis. The defendant then consented to a search of her carry-on bag in a nearby room. While in the room, she also consented to a search of her purse, which contained cocaine."

### B. The "Statistics"

Both this court and the United States Court of Appeals for the Sixth Circuit have been concerned for the last several years about the preponderance of African–Americans and Hispanics charged as drug couriers at airports. In 1992, for example, all of the twenty-one individuals arrested at the Airport and prosecuted in this court, save one, were either African–American or Hispanic.

The Court of Appeals has addressed the issue in at least two opinions, one *en banc* and one unpublished. *United States v. Taylor*, 956 F.2d 572 (6th Cir.) (*en banc*), *cert. denied*, —— U.S. ——, 113 S.Ct. 404, 121 L.Ed.2d 330 (1992) and *United States v. Jennings*, 985 F.2d 562 (6th Cir.1993) (unpublished) (available at 1993 WL 5927). In both cases, the Sixth Circuit concluded that the particular defendants involved had not presented any evidence to show a racial component in airport encounters by the Drug Task Force.

At this court's suggestion, the Airport Task Force agreed to compile what figures it had with the caveat that the data on which they were based had not been kept for statistical purposes and could be called "statistics" only in the most inexact sense.

Although officially there are no "statistics" compiled by the Task Force concerning whom they encounter each day, there is certain information stored in the form of computerized police "incident" reports. Lieutenant Gayle L. Blackburn, supervisor of the Special Operations Section at the Airport (which includes Drug Task Force personnel) culled the database to compile whatever relevant race, ethnicity, or gender information was contained therein. *See* Joint Ex. 1.

The sample culled from the computer files has limitations. The first is that encounters with travelers that terminate abruptly are not reported in the sample. The officers estimate that the nonreported encounters make the sample underrepresentative of total approaches by about half. An abrupt encounter, for example, occurs if, after approaching and questioning the traveler, the officers are satisfied there is nothing suspicious afoot.

"In a calendar year numerous consensual interviews take place wherein the officer immediately becomes aware that the circumstances or conduct involved in no way relate to drug or criminal activity, at which time the interview is terminated and the person thanked for their cooperation.

"In many cases this is done prior to identification having been obtained and obtaining same would serve no useful purpose to law enforcement. In these cases, no entry [into the police computer database] is made.

\*　　\*　　\*　　\*　　\*　　\*

"In cases where persons with whom the officers had consensual contact and through said contact deemed the persons not to be suspicious, no entry is made."

Joint Ex. 1 (92–50). Thus, an encounter with an African–American journalist, who testified that he was approached and that questioning ceased after he displayed identification showing that he worked for *The Cincinnati Post,* is not listed in an incident report or contained in the database.

But if the police are satisfied that there is something suspicious or have reason to suspect the traveler may be carrying drugs or drug proceeds, they may continue to ask questions and ask the traveler for consent to search the person and his or her luggage, and these encounters are recorded. That does not mean, however, that each recorded encounter results in an arrest or seizure.

"The attached statistical data reflects only persons who were [1] interviewed by Task Force Officers and were found to be in possession of narcotics proceeds or narcotics or [2] persons who, after having been consensually interviewed raised a level of interest or suspicion such that the officer believed a possibility existed that these persons could have been involved in illegal activity, but at the time of interview, probable cause for a warrant or arrest did not exist."

Joint Ex. 1; *see also* Travis Hrg. 4/2/93, p. 94. There are other qualifications to the sample as well.[1]

The "statistics" submitted at the hearing show the incidence of stopping minorities at the Airport is disproportionate to that for whites when compared with total number of travelers. Although there are no comparable figures for the Airport in the record, nation-

---

1. The only incident reports included in the sample are those where one of the officers attached to the "APTF"—the acronym for Airport Police Task Force—is named as "handling" the cases. Thus, the incident report numbers skip, leaving sequential gaps. Joint Ex. 1 (parameters for printout defined as "all dates [of the year]; all agencies matching 'APTF'; all officers; all dispositions; all natures; all locations."); *Travis Hrg.* 4/2/93 p. 86–87 (Blackburn).

Also, not all of the incident reports contained discernible racial, gender, and ethnic informa-tion, and some of the incidents do not involve Airport drug encounters. Thus, approximately one-third of the listed incident reports for 1991 and almost one half of the incident reports for 1992 ultimately do not contribute to the sample size.

Finally, the number of "incident" reports does not directly correlate to the number of people or race/ethnicity of the people involved in the encounter.

ally, the racial and ethnic division of all airline travelers is as follows: 88% White; 5% African–American; 1% Asian; 1% Hispanic; 4% "other;" and 1% refusing to give information. Even assuming that Airport travelers consist of 12% African–Americans and 9% Hispanics (21% collectively), and 79% white,[2] the statistics show that African–Americans and Hispanics are at least twice as likely to be encountered, and the trend in 1992 is even more disproportionate.

For example, Officer Blackburn's testimony indicated that for 1991 a total of 263 people were encountered and of them 100 (38%) were white, 130 (49.5%) were African–American; and 33 (12.5%) were Hispanic. For 1992, he testified that a total of 226 people were encountered and of them 59 (26%) were white, 163 (55.7%) were African–American, and 41 (18.1%) were Hispanic. An expert testified to the disproportionality of these percentages, but his fee could have been saved, because this fact is obvious from even a cursory examination of the figures. See Travis Hrg. 4/2/93, p. 9 (Snyder's observations based on Officer Blackburn's figures).

Although these "statistics" are limited, the court cannot dismiss them out of hand. Officer Blackburn testified that he believes the sample is representative of the racial composition of consensual encounters at the Airport. Officer Jones testified that two-thirds of the people he encounters are African–American, an estimate which matches the figures.

The officers emphatically deny any intent to discriminate. The officers say persons are selected for an encounter, not on the basis of race but rather as a result of "training, experience, intelligence." Indeed, Lt. Blackburn testified that any officer who encountered someone solely on the basis of race "would no longer be an officer." It must be noted that the officers make no claim that the encounters are random. Absent a tip regarding a specific individual, the stops are in part the result of the officers focusing their efforts on flights from "source cities," in this case Los Angeles. Further, and more importantly, the officers act on the basis of certain intelligence information learned at a seminar in Los Angeles in 1991.

Lt. Blackburn explained, in his view, the racial disparity in the encounters:

"Yes, I have an idea of my own theory. I don't have a degree or [social work] major, or anything like that. Basically my explanation of it is, a large percentage of the drug trafficking, particularly cocaine trafficking in this country, is done by black gangs out of Los Angeles, California. They control the drug trafficking on the streets in America in most of the big cities now. And it is apparently convenient, people are apparently easily obtained who are willing to take a package, a suitcase, whatever, containing drugs from, let's say Los Angeles to Cleveland, Ohio and run a terrible risk of going to prison for five or 10 years for [$]500, $1,000, $1,500. I guess maybe there is more people in Los Angeles, California readily available to do this kind of thing for that kind of money; and not just Los Angeles, but the other cities around the country, too.

"Most of the people—it may not be the case with this defendant, but most of the people that we encounter are lower socioeconomics [sic] status as far as where they live, their income. Most of them are unemployed, first of all. They need money, and this is a quick way of getting money, carrying a suitcase from point A to point B, it takes maybe a day's time and you can make $1,500."

Id. pp. 108–9.

He further testified that, after the court's expression of concern, he considered encountering more whites to balance out the numbers, but rejected this possibility because the agents would be "talking to a lot of people that we know or in our own minds believe are not drug couriers just to satisfy certain criteria." Id. p. 107.

2. There are no figures for the airline travelers at the Airport. The averages found in the Greater Cincinnati population generally are: 87.2% white; 11.7% black; .8% Asian; and .05% Hispanic. See Stipulations. The 1990 census data shows similar averages: 80.3% white; 12.1% black; and 9% Hispanic.

Thus the agents are of the belief that only a minute percentage of the air traveling public are couriers and that focusing on minorities from the Los Angeles flights is an effective use of law enforcement resources as indicated by the number of successful prosecutions. The statistics show that focusing on African–Americans and Hispanics has led to twenty-seven convictions out of approximately 600 encounters from a population of approximately two million travelers. Intuition also indicates that there is only a small percentage of airport drug couriers. Of course, and as the court recognizes, there is no objective way to measure whether the agent's perceptions are accurate, since there are no statistics showing how many drug shipments actually travel through the airport each year.

## III. ANALYSIS

The scenario set out above presents this court with a constitutional problem of considerable difficulty—the necessity of balancing the right of a free person to go about unhampered by law enforcement officers against the interest of combating drug trafficking, which is a critical problem in our society. Although the courts have been struggling with the "airport profile"[3] for years, the precedents do not yield a ready solution to the problem.

### A. Fourth Amendment

The dynamics of the typical airport encounter by the agents fall into distinct stages. The Fourth Amendment is implicated in different ways at each stage.

■ *Stage One—The Pre–Contact Stage.* The officers choose whom to look for in the airport in three ways: (a) by receiving a tip concerning a particular passenger; (b) by scrutinizing the passenger list perhaps followed by obtaining ticketing information; or (c) physical or electronic visual surveillance of a traveler. A combination of these methods may be utilized. At this level, the traveler is unaware that he or she is under scrutiny by the agents.[4]

■ *Stage Two—The Encounter.* The officers approach a traveler and ask for identification, identify that they are patrolling the airport for drugs, and ask other general questions such as name, address, or place of origin or destination.

If the traveler consents to speak with the officers, the Fourth Amendment is not implicated as long as the encounter remains truly consensual. The rationale is that mere cursory questioning by a law enforcement officer does not violate the liberty of the individual to go about his or her business, because the traveler is free to decline to engage in conversation. *Florida v. Bostick,* —— U.S. ——, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991); *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *Taylor,* 956 F.2d at 575–76; *United States v. Flowers,* 909 F.2d 145 (6th Cir.1990). Therefore, by necessary inference, the Fourth Amendment is also not implicated at stage one, where the individual is not even aware that he or she is under scrutiny.

■ If, however, the individual has a subjective and reasonable perception that he or she is not free to end the encounter and leave, then a "seizure" occurs. At the point of seizure, the officers must have an "articulable suspicion" for the encounter to continue. *Mendenhall,* 446 U.S. at 551–52, 100 S.Ct. at 1875–76; *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *cf. United States v. Garcia,* 866 F.2d 147 (6th Cir.1989). "The temporary detention of a person meeting the drug courier profile ... although constituting a seizure, would not offend the fourth amendment." *Flowers,* 909 F.2d at 147.

■ *Stage Three—Search of Person and/or Luggage.* At the encounter stage, sometimes the officers' suspicions are further aroused and, therefore, they will ask permission to search the traveler's luggage and/or his or her person. Again, if the interaction remains truly consensual, the Fourth Amendment is not implicated. However, the

---

3. The officers do not deny the existence of the "profile" *per se,* but do deny that it exists in writing or that the characteristics are fixed.

4. This stage is not usually discussed in the cases but this court believes it is necessary to the analysis.

luggage or person could be temporarily detained absent consent if all of the information available to the officer from the previous stages provides the appropriate grounds for doing so. *E.g., United States v. Respress,* 9 F.3d 483, 485–87 (6th Cir.1993); *Taylor,* 956 F.2d at 578; *Flowers,* 909 F.2d at 147.

*Stage Four—Arrest.* This usually occurs when contraband is found as a result of a consensual search.[5]

■ In this case, although defendant claims that she did not consent to the search which yielded the drugs and gave probable cause for her arrest, the court accepts the finding of the Magistrate Judge that the search was consensual. The interaction proceeded from targeting, to a consensual encounter, to a consensual search yielding the drugs that gave probable cause for arrest. Accordingly, the Fourth Amendment is not violated in this case.

### B. The Equal Protection Clause

■ The figures introduced by the agents clearly show that the agents choose to encounter African–Americans and Hispanics in numbers far in excess of what probability would predict. The justification offered by the agents is that they are not proceeding entirely on the basis of race. Rather, they proceed on intelligence, experience and instinct. Since their intelligence information indicates that the Crips and Bloods are a large factor in the inter-city drug traffic and that these gangs are primarily using African–American and Hispanic females as couriers, the agents select African–Americans and Hispanics (mostly females) for surveillance. This, of course, leads to the great preponderance of African–American and Hispanic subjects at the later levels of encounter, search and arrest.

The equal protection precedents are not clear, especially as applied to the factual situation at bar. However, hypothesizing the existing precedents, the rule seems to be that police investigations which have a disproportionate impact on minorities are held not to offend the Constitution unless the targeting is based solely on race. Furthermore, even if a *prima facie* equal protection violation is established, effective drug interdiction is recognized as a compelling government interest that defeats the claim.

#### (1) *Supreme Court Precedents*

At least two Supreme Court cases expressly consider race in the search and seizure context. *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), nominally a Fourth Amendment case, holds that race alone may not give rise to reasonable suspicion justifying a *Terry* stop. However, the Court in *United States v. Martinez–Fuerte,* 428 U.S. 543, 563, 96 S.Ct. 3074, 3085, 49 L.Ed.2d 1116 (1976), held that race, as the basis of a "referral" for more intense questioning at a checkpoint for illegal aliens, involves "no constitutional violation."

*Brignoni–Ponce* involved a roving patrol by border patrol agents near the border. The agents stopped a car and questioned its occupants solely on the basis that some of the occupants appeared to be Mexican. As it turned out, some of them were illegal immigrants. At the time, the concept of the consensual encounter had not evolved. Later, the court characterized the *Brignoni* stop as nonconsensual because it involved stopping an automobile.[6]

Although the equal protection clause was not expressly mentioned by the Court, in this judge's view, in considering contacts based on race and holding that race could not be the sole factor arousing the justifiable suspicion necessary for a *Terry* seizure, the Court did implicitly consider the equal protection question. The Court did clearly state that the use of a list of characteristics in addition to race—a sort of illegal alien profile—could justify such a seizure.

"Any number of factors may be taken into account in deciding whether there is reasonable suspicion to stop a car in the

---

5. *Not every arrest at the airport follows the stages exactly. Some stages may be skipped. For example, if the targeting surveillance revealed highly suspicious activity, the agents* could proceed immediately to a *Terry* stop or perhaps to an arrest.

6. *Mendenhall,* 446 U.S. at 556, 100 S.Ct. at 1878.

border area. Officers may consider the characteristics of the area in which they encounter a vehicle. Its proximity to the border, the usual patterns of traffic on the particular road, and previous experience with alien traffic are all relevant.... They also may consider information about recent illegal border crossings in the area. The driver's behavior may be relevant, as erratic driving or obvious attempts to evade officers can support a reasonable suspicion.... Aspects of the vehicle itself may justify suspicion. For instance, officers say that certain station wagons, with large compartments for fold-down seats or spare tires, are frequently used for transporting concealed aliens.... The vehicle may appear to be heavily loaded, it may have an extraordinary number of passengers, or the officers may observe persons trying to hide.... *The government also points out that trained officers can recognize the characteristic appearance of persons who live in Mexico,* relying on such factors as the mode of dress and haircut.... In all situations the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling....

"In this case the officers relied on a single factor to justify stopping respondent's car: the apparent Mexican ancestry of the occupants. We cannot conclude that this furnished reasonable grounds to believe that the three occupants were aliens.... Even if they saw enough to think that the occupants were of Mexican descent, this factor alone would justify neither a reasonable belief that they were aliens, nor a reasonable belief that the car concealed other aliens who were illegally in the country. Large numbers of native-born and naturalized citizens have the physical characteristics identified with Mexican ancestry, and even in the border area a relatively small proportion of them are aliens. *The likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor, but standing alone it*

*does not justify stopping all Mexican–Americans to ask if they are aliens."*

*Brignoni–Ponce,* 422 U.S. at 884–86, 95 S.Ct. at 2582–83 (citations and footnotes omitted) (emphasis added).[7]

*Martinez–Fuerte* involved a fixed checkpoint on a main highway near the Mexican border, set up to check for illegal immigrants. The encounters were in two stages. At the first stage all vehicles were stopped. After preliminary questioning, some travelers were referred to a second stage for more intense questioning. The case explicitly mentioned only the Fourth Amendment, but is relevant also to the equal protection analysis.

"We further believe that it is constitutional to refer motorists selectively to the secondary inspection area at the San Clemente checkpoint on the basis of criteria that would not sustain a roving-patrol stop. *Thus, even if it be assumed that such referrals are made largely on the basis of apparent Mexican ancestry, we perceive no constitutional violations. Cf. United States v. Brignoni–Ponce,* 422 U.S., at 885–887 [95 S.Ct. at 2582]. As the intrusion here is sufficiently minimal that no particularized reason need exist to justify it, we think it follows that the Border Patrol officers must have wide discretion in selecting the motorists to be diverted for the brief questioning involved.[17]

\* \* \* \* \* \*

"17 Of the 820 vehicles referred to the secondary inspection area during the eight days surrounding the arrests involved in No. 74-1560, roughly 20% contained illegal aliens. *Supra,* [428 U.S.] at 554 [96 S.Ct. at 3081]. Thus, to the extent that the Border Patrol relies on apparent Mexican ancestry at this checkpoint, see n. 16, *supra,* that reliance clearly is relevant to the law enforcement need to be served. *Cf. United States v. Brignoni–Ponce, supra,* [422 U.S.] at 886–887 [95 S.Ct. at 2583],...."

*Martinez–Fuerte,* 428 U.S. at 563–64 & n. 17, 96 S.Ct. at 3085 & n. 17 (emphasis added).

---

7. In *Mendenhall* the Court expressly approved use of an "airport profile." The case, however, did not involve a contention of racial discrimina-

tion in use of the profile. Accord: *U.S. v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).

### (2) *Sixth Circuit Precedents*

In *Taylor*, the Sixth Circuit touched upon whether equal protection analysis was appropriate in search and seizure cases. There, the *en banc* court reconsidered a panel decision invalidating an arrest evolving from an encounter which the panel held violated the equal protection clause. The court held that the panel had improperly reached the equal protection issues because of an inadequate record, saying:

"A review of the suppression hearing transcript, the briefs and arguments of counsel before the trial court and initially before this court, disclosed no charge that the appellant herein had been selected for a consensual interview because he was an African–American, that the law enforcement officers at the Memphis Airport implemented a general practice or pattern that primarily targeted minorities for consensual interviews, or that they had incorporated a racial component into the drug courier profile. A factually supported record of such charged official conduct in the instant case would have given rise to due process and equal protection constitutional implications cognizable by this court."

*Taylor*, 956 F.2d at 578–79.

In a concurring opinion, Judge Guy agreed that "[i]f it were to be shown, for example, that the persons selected for consensual interviews are African–American, who are stopped only because they are African–American, then I would find the procedure raises serious constitutional concerns." *Id.* at 579.

In an unpublished opinion in *Jennings*, a panel of the court again held that the defendant had failed to make the necessary record to trigger equal protection scrutiny, but said in dicta:

"When a consensual interview takes place, a seizure has yet to occur, and so the Fourth Amendment is not called into play.... That does not mean, however, that a consensual interview does not implicate the Fourteenth Amendment. To our knowledge no court has held that 'where first encounters are consensual, racial considerations are irrelevant.' ..."

"Central to the Equal Protection Clause of the Fourteenth Amendment 'is the prevention of official conduct discriminating on the basis of race.' ... Law enforcement is quintessential official conduct—the police function being 'one of the basic functions of government.' ... *A law enforcement officer would be acting unconstitutionally were he to approach and consensually interview a person of color solely because of that person's color, absent a compelling justification. Further, evidence seized in violation of the Equal Protection Clause should be suppressed.* 'No distinction can logically be drawn between evidence obtained in violation of the Fourth Amendment and that obtained in violation of the Fourteenth. The Constitution is flouted in either case.' ..."

"Racial classifications 'are subject to the most exacting scrutiny; to pass constitutional muster, they must be justified by a compelling governmental interest and must be "necessary.... to the accomplishment" of their legitimate purpose.' 'Determining whether invidious discriminatory purpose was a motivating factor' behind the officers' actions 'demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.' ... *In order to show that an equal protection violation has occurred, the defendant must show, by a preponderance of the evidence, that the officers who stopped him single out racial minorities for treatment different from the treatment given to non-minorities.* The defendant could try to do this through evidence that these officers stop individuals on account of their race, or by offering statistical proof of some sort, for example about a larger population of airport narcotics officers, from which a strong inference could be made that the officers here engaged in intentional discrimination. *Assuming the defendant makes such a showing, the burden then would shift to the government to rebut the presumption of unconstitutional action or to identify a compelling governmental interest for the race-based airport stops.* If the government did not meet this burden, then the court would be in a position to

find that the defendant's equal protection rights had been violated."

*Jennings, supra* (citations and footnotes omitted) (emphasis added); *see also* Peter Schoenling & Risa Evans, *Unspeakable Suspicions: The Racist Consensual Encounter, The Champion,* Nov. 1993 (advocating same burden-shifting approach); Sheri Lynn Johnson, *Race and the Decision to Detain A Suspect,* 93 *Yale L.J.* 214 (1983) (same).

### (3) *Synthesis*

While the Supreme Court precedent has not expressly addressed the equal protection aspects of search and seizure jurisprudence, its Fourth Amendment analysis in the cases above appears applicable to the equal protection issue as well. The Sixth Circuit has spoken only in dicta, but very strong dicta, to the effect that the equal protection clause applies at the consensual encounter level and beyond and, if the clause was violated, the exclusionary rule should be invoked.

This court believes that the rationale of the Supreme Court in *Brignoni–Ponce* and *Martinez–Fuerte* would be used by the Court if it were to decide the equal protection issues. This court is led to this conclusion by the fact that the Court expressly considered the same factors addressed by the dissenting judges in *Taylor,* that this is a free society, that criminal suspects are a minute part of the traveling public, and that the rights of innocent persons who might also be stopped must be considered.

*Brignoni–Ponce* and *Martinez–Fuerte* involved involuntary stops rather than consensual encounters. But the strong Sixth Circuit dicta leads the court to hold that the criteria set forth in these cases should be applied to consensual encounters as well, where, as here, the defendant has shown a racially disproportionate number of encounters.

It must be noted, however, that the precedents do not establish any constitutional restrictions at the pre-contact level. *Brignoni–Ponce* indicates directly to the contrary in

that the above quotation implies a period of surveillance based on the subject's appearance from which "reasonable suspicion" justifying a *Terry* stop might arise.

■ This court holds that in the Sixth Circuit a consensual encounter may not be initiated solely on the basis of race. Rather, a subject must meet other sufficient criteria disclosed at the pre-contact level, such as fitting the profile characteristics and/or suspicious behavior.

■ In ascertaining the legitimacy of such criteria, the *Jennings* analysis should be employed. That is, if the defendant shows that the officers single out racial minorities for treatment different from the treatment given to non-minorities, the burden shifts to the government to rebut the presumption of unconstitutional action or to identify a compelling governmental interest for the disparate impact. *Jennings, supra.*

This court holds that the defendant here produced sufficient evidence through the agents' testimony to shift the burden to the government. This court holds further, however, that the government met the burden of justifying the consensual encounter with the defendant by the profile [8] characteristics of the defendant and by the agents' uncontested testimony concerning the intelligence they had concerning the Crips and the Bloods.

Further, the court holds that the need to interdict the interstate traffic in street drugs constitutes a compelling governmental interest justifying the methods used by the agents under the circumstances in this record.

As Justice Powell stated in his concurring opinion in *Mendenhall:*

"The public has a compelling interest in detecting those who would traffic in deadly drugs for personal profit. Few problems affecting the health and welfare of our population, particularly our young, cause greater concern than the escalating use of controlled substances. Much of the drug traffic is highly organized and conducted

---

**8.** Many have disparaged the "airport profile" on the grounds that it is overly flexible. Its use, however, has been expressly approved by the Supreme Court. *E.g., Sokolow,* 490 U.S. at 8–11,

109 S.Ct. at 1586–7; *Mendenhall, supra. Sokolow* held the airport profile may justify a *Terry* stop.

by sophisticated criminal syndicates. The profits are enormous. And many drugs, including heroin, may be easily concealed. As a result, the obstacles to detection of illegal conduct may be unmatched in any other area of law enforcement."

*Mendenhall,* 446 U.S. at 561-2, 100 S.Ct. at 1880.[9]

## IV. CONCLUSION

For the reasons stated above, the motion to suppress must be denied. This result should not be construed as indicating the court's endorsement of the methods used by the agents. Indeed, the court is deeply disturbed that such an overwhelmingly disproportionate number of the encounters and arrests at the Airport involve minorities.

It is true that the agents' methods are apprehending drug couriers with greater success than random stops, but at a great cost. These methods give innocent minority citizens the perception that they are the victims of selective law enforcement.

The court's intuition tells it that there are probably a number of white couriers going through the Airport who are escaping scrutiny because the agents are focusing on minority females coming from Los Angeles. However, the court does not believe the agents are doing this with a discriminatory motive; it is probably just the course of least resistance.

The court has no jurisdiction in this case to order the agents to alter their methods to lessen the discriminatory impact. If a member of the traveling public were to bring a civil rights suit, the situation would be different and such relief might be appropriate. *See INS v. Delgado,* 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984). It must be noted that the court's only options in this case are to grant or deny the motion to suppress. As explained, the precedents require that the motion be denied. To do otherwise would free guilty drug couriers.

Nonetheless, the court has no hesitancy in stating that some sort of system screening all or randomly selected airline passengers and/or their baggage would be far preferable than the procedures currently employed.

For the reasons stated above, and the court having reviewed the objections to the Report and Recommendation of the United States Magistrate *de novo,*

**IT IS ORDERED** as follows:

1. That the objections to the Report and Recommendation be, and they are, hereby overruled;

2. That the motion to suppress filed by defendant be, and it is, hereby denied; and

3. That trial of this matter will proceed as previously scheduled on Monday, December 6, 1993 at 10:00 a.m.

---

9. The United States argues that a specific intent to discriminate is necessary to violate the equal protection clause. The court accepts the testimony of the agents that their motive is effective law enforcement. *Brignoni–Ponce, Taylor,* and *Jennings,* however, implicitly reject the government's argument looking to the disparate impact and its justification rather than the subjective intent of the agents.