**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Angela TRAVIS, Defendant–Appellant.**

**No. 94–5771.**

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 30, 1995.

Decided Aug. 16, 1995.

Sean Connelly (argued and briefed), U.S. Dept. of Justice, Washington, DC, Frederick A. Stine, V, Asst. U.S. Atty., Covington, KY, for U.S.

Steven N. Howe (argued and briefed), Fossett, Howe, Wessels & Ogle, Ft. Wright, KY, for Angela Travis.

Before MERRITT, Chief Judge, BATCHELDER, Circuit Judge, and WEBER, District Judge.*

MERRITT, C.J., delivered the opinion of the court, in which WEBER, D.J., joined. BATCHELDER, J. (p. 176), delivered a separate opinion concurring in the result.

MERRITT, Chief Judge.

The defendant, Angela Travis, appeals her conviction for possession with intent to distribute cocaine under 21 U.S.C. § 841(a)(1) because she contends that the police officers who uncovered the drugs in her luggage at the Cincinnati Airport violated her Fourteenth Amendment rights when they chose her for a so-called "consensual encounter" or airport stop. Specifically, Travis argues that the officers who searched her luggage at the Greater Cincinnati/Northern Kentucky International Airport selected her as a potential drug courier solely because of her race. The District Court rejected Travis' argument, and we affirm that ruling.

## I. Facts

On August 11, 1992, Airport Detective Mike Evans decided to focus on a flight arriving in Cincinnati/Northern Kentucky Airport from Los Angeles to attempt to catch and arrest drug couriers. Detective Evans testified that he had selected this arrival, Delta flight 1026, because it had been the source of numerous drug arrests in the past.

Before the airplane landed, Evans examined the list of passengers to review names of anyone connecting to a city known for drug distribution such as Cleveland, Hartford, Ft. Wayne or New York. Evans testified that he always concentrates on the passengers destined for Cleveland first because investigations of these passengers have produced many arrests in the past.

In reviewing the list of passengers, Evans testified that he looks for names that pique his interest. On this day, the name "Angel Chavez" attracted his attention. He stated that the name seemed suspicious to him because it consisted of an unusual first name and a common surname. Evans observed that "Chavez" is a common Hispanic surname, similar to Smith or Jones, but that "Angel" seemed "a little bit unusual to me." Evans testified that drug couriers in the past had assumed aliases such as "Smith" or "Jones" while others had chosen names such as "Vanessa Redgrave" and "Valencia Orange". In particular, Evans suggested that some drug couriers will change only their last name to a very common one in order to avoid suspicion. He noted that one drug courier, Shirley Thornton, had adopted the alias "Shirley Jones". Thus the juxtaposition of a somewhat unusual first name with a very common surname can arouse enough suspicion to warrant further inquiry. Evans denied that he selected "Chavez" because the name was Hispanic and pointed out that he had chosen not to investigate two other passengers with Hispanic surnames, Diaz and DelNegro, who were destined for Cleveland.

Evans then requested additional information on Chavez from the Delta representative. He was informed that Chavez had purchased a one-way ticket from Los Angeles to Cleveland five hours before the flight at the Ingelwood Travel Agency. According to Evans, drug couriers virtually always travel on one-way tickets. Furthermore, purchase of a ticket just hours before a flight departs also arouses suspicion of drug courier activity. Finally, Evans testified that he recognized the Ingelwood Travel Agency as one located

* The Honorable Herman J. Weber, United States District Judge for the Southern District of Ohio, sitting by designation.

within the Los Angeles airport that had sold tickets to several drug couriers arrested in past cases.

At this juncture, Detective Evans decided to find Chavez when she departed from the airplane and question her. With other officers, Evans waited at Gate 20 as the passengers from Los Angeles deplaned. Because they were looking for a Hispanic woman, none of the officers paid attention to the defendant, an African–American, as she left the plane and the gate area. Once everyone on the flight from Los Angeles had deplaned and the officers did not spot anyone who might be Chavez, they proceeded to Gate 24 where the flight to Cleveland was scheduled to board. Evans testified he was looking for a woman travelling alone. He noticed only two women waiting unaccompanied at Gate 24. Both were African–American. He approached the first woman, who had just finished a telephone call. She informed Evans that her name was Gail Jordon and that she was travelling on a round-trip ticket.

Evans then approached the defendant who was sitting behind the ticket counter, the only remaining unaccompanied woman at Gate 24. He sat down next to her, showed her his badge, indicated he was an airport police officer and asked if he could talk to her for a moment. She agreed. Evans then asked if he could see her airline ticket. The defendant produced her ticket which was issued to "Angela Chavez," not "Angel Chavez." Evans asked the defendant if this was her real name, and the defendant said that the travel agency had spelled it incorrectly. At his request, the defendant handed Detective Evans an Ohio driver's license in the name of Angela Travis. Evans then informed her that he was looking for narcotics or narcotics proceeds and asked permission to look in her bags. He also told her if she felt more comfortable he would look inside her bags in a more private place. The defendant agreed to allow Evans to search her bags, but did request that the search be conducted in a more private place. Evans and his partner Detective Carl Parker led the defendant to an airline hospitality suite where Evans searched the defendant's carry-on bag and Parker searched her purse. Par-

ker found cocaine in the defendant's purse and the detectives arrested her.

In two hearings before a magistrate and one before the District Court, the defendant moved to suppress the evidence found in her purse on the grounds that the detectives had discriminated against her on the basis of her race. *United States v. Travis,* 837 F.Supp. 1386 (E.D.Ky.1993). After the District Court denied the motion to dismiss, Travis entered a conditional guilty plea reserving her right to appeal the denial of her motion. Travis timely filed her appeal and we now address the question of whether the detectives violated the defendant's Equal Protection rights when they selected her for a consensual interview.

■ It is important to note at the outset that the defendant does not claim that the detectives violated her Fourth Amendment rights to be free from unreasonable searches and seizures. So long as a defendant feels free to leave or decline to answer questions, police officers may approach a suspect and engage in a "consensual encounter" without the need to articulate any particular level of suspicion. The Supreme Court has held that "even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, ask to examine the individual's identification, and request to search his or her luggage—as long as the police do not convey a message that compliance with their requests is required." *Florida v. Bostick,* 501 U.S. 429, 434–35, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991) (citations omitted). The District Court found that the encounter and the search were both consensual. *Travis,* 837 F.Supp. at 1392.

## II. Analysis

■ The heart of this case turns on the question of whether the officers selected the defendant for a consensual encounter based solely on her race. This court has addressed this issue only once before in an unpublished opinion. *United States v. Jennings,* 985 F.2d 562 (6th Cir.1993) (unpublished) (available at 1993 WL 5927). We hold that *Jennings* correctly ruled that consensual searches may violate the Equal Protection Clause when they are initiated solely based on racial con-

siderations. The government concedes that consensual encounters and searches based solely on race may violate the Equal Protection Clause of the Fourteenth Amendment even though they are permissible under the Fourth Amendment. (Appellee's Brief at 16).

In *Jennings*, we said that "a law enforcement officer would be acting unconstitutionally were he to approach and consensually interview a person of color solely because of that person's color, absent a compelling justification." *Jennings*, at *4. Further, we stated that a defendant would have to demonstrate by a "preponderance of the evidence" that a police officer decided to approach him or her solely because of his or her race. A defendant may put forward evidence suggesting that the consensual interview in his or her particular case was initiated solely because of his or her race. In the absence of other proof, persuasive statistical evidence about a larger population of airport encounters may also create a strong inference that officers chose to engage in a particular consensual interview solely because of the interviewee's race.

Once the defendant has produced some factual or statistical evidence, the officers must then produce evidence that contradicts the defendant's claim that they acted based solely on racial considerations, or identify a compelling governmental interest for the race-based interviews. Nonetheless, the burden of proof remains with the defendant. Obviously race or ethnic background may become a legitimate consideration when investigators have information on this subject about a particular suspect. If, for example, officers know that a bank robber was white, the officers may limit their investigation to whites.

In some instances, officers may decide to interview a suspect for many reasons, some of which are legitimate and some of which may be based on race. In such instances, as the District Court noted, the use of race in pre-contact stage does not give rise to any constitutional protections. *Travis*, 837 F.Supp. at 1395 (relying on *United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)). Consequently, when officers compile several reasons before initiating an interview, as long as some of those reasons are legitimate, there is no Equal Protection violation. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (holding that when school district fires teacher for several reasons, even if one reason standing alone would violate teacher's First Amendment rights, no constitutional violation if other reasons are legitimate).

If a court determines that officers initiated a consensual interview solely for racial reasons, there is some dispute as to what remedial action is appropriate. The defendant in this case argues that the exclusionary rule should apply, even though that rule usually applies only to violations of the Fourth Amendment. We have no need to reach this question because the detectives in this case did not choose to interview the defendant solely because of her race. Therefore, they did not violate her rights under the Equal Protection Clause.

In this case, it is clear that in the pre-contact stage the detectives developed several reasons for approaching the defendant that were completely independent of her race. Although we have looked skeptically in the past on police claims that they may legitimately target passengers from "source cities," *Jennings*, at *5; *United States v. Andrews*, 600 F.2d 563, 566–67 (6th Cir.), *cert. denied*, 444 U.S. 878, 100 S.Ct. 166, 62 L.Ed.2d 108 (1979), the detectives here accumulated information about the defendant that legitimately led them to suspect she might be a drug courier. Before confronting the defendant, the detectives knew that she had purchased a one-way airline ticket five hours before the flight left at a travel agency known to them to issue tickets to significant numbers of drug couriers. Indeed, Detective Carl Parker noted based on past experience that a one-way ticket is "very common" among drug couriers and "one of the big things" that raise officers' suspicions. Detective Evans testified that virtually every drug courier he has arrested has been travelling on a one-way ticket. This information alone, while not substantial enough to constitute

probable cause, was certainly a non-racial reason that motivated the detectives to initiate a consensual encounter with the defendant. Therefore, the defendant cannot argue that the detectives approached her solely because of her race.

Furthermore, the detectives believed that the defendant was travelling under a suspicious name that might have been an alias. As it turned out, they were correct. The defendant argues that the officers selected the name "Angel Chavez" purely because it was Hispanic. We disagree. The detectives demonstrated that in the past they have focused on surnames of passengers who are not minorities. Furthermore, we find credible their guess about why this particular name raised suspicions. In addition, they did not investigate other Hispanic passengers on the plane. When selecting a name from a passenger list, rarely will officers be presented with a name like "Valencia Orange". More often they will have to rely on intuition and experience to decide which names deserve further investigation. Therefore, they must be given substantial latitude in following these hunches. When the defendant calls the detectives' explanations pretexts for a race-based decision, in effect she argues that every time officers select an Hispanic surname for further investigation they are presumptively acting on the basis of race. This argument is untenable and would unduly limit the detectives' ability to investigate.

■ The defendant's primary argument rests on statistics. She contends that the "incident reports" compiled by the Airport Police Task force reveal that officers in the airport have interviewed a disproportionate number of minorities. But the methodology used to compile these numbers is deeply flawed—so much so that the numbers do not reliably report any data that could give rise to an inference of racial discrimination.[1] First, the "incidents" do not include all consensual encounters between officers and passengers. Officers only report those incidents in which a passenger has been arrested, or if there was not sufficient evidence to arrest a

passenger, those incidents in which the police believed the person interviewed nonetheless was involved with drugs in some capacity. Consequently, the statistics do not give a representative picture of the people whom the airport police approach for interviews. All contacts with "innocent" passengers who did not provoke suspicion are not included in the reports. It may be that contacts with innocent passengers form the vast majority of all consensual interviews, and therefore the statistics based on the "incident reports" rather than on "consensual encounters" do not reflect accurately whether the police disproportionately target members of certain minority groups.

Furthermore, the statistics do not even include all "incidents." Any arrests or suspicions reported by police other than Airport Police Task Force were not included in the sample. In addition, some of the reports by the Airport Task Force did not include information regarding the race of the person encountered by the police. In all, one-third of incident reports for 1991 and one-half of the reports for 1992 could not be used in compiling the statistics.

Finally, the statistics only focus on the race of airplane passengers generally, and on the race of all "incidents" in the Airport. No numbers have been provided regarding the race of passengers travelling this particular route from Los Angeles to Cleveland, or the race of those targeted for interviews who travel that route. In sum, these statistics do not provide sufficient information for a court to conclude anything about the nature of the consensual encounters in the Cincinnati airport, or about people travelling this route. They are not a reliable basis for an inference of discrimination.

The defendant also claims that all of the reasons stated by the officers were actually pretexts for their decision to interview her because of her race. We have already addressed and rejected the argument that the only reason they selected her from the passenger list was because her name was "Chavez". In another argument, the defendant

---

1. The defendant cites the "incident report" numbers from 1991 and 1992. In 1991, 38% of the people listed in the reports were white, 49.5% were African American and 12.5% were Hispanic. In 1992, 26% of those encountered were white, 55.7% were African American and 18.1% were Hispanic. The District Court estimated that airplane passengers nationwide are 88% white, 5% African American, and 1% Hispanic. *Travis*, 837 F.Supp. at 1390.

claims that the detectives only approached African–American women outside Gate 24 (the gate for the flight to Cleveland). While this is true, the detectives responded that the only unaccompanied women waiting at that gate were both African–American. Since the detectives knew they were looking for a woman travelling by herself, the fact that both potential passengers waiting at Gate 24 who fit that description were African–American was merely incidental.

■ Lastly, the defendant's argument on this point suggests that the officers did not care whether the defendant was African–American or Hispanic. According to the defendant, the officers were looking to interview any minority traveller. The defendant has argued that the detectives intended to discriminate against Hispanics because they selected the name "Chavez." Then she has suggested that the officers were intending to discriminate against African–Americans because they only questioned African American women at Gate 24. Charges of discrimination against all minorities as a single undifferentiated class are by their very nature less convincing than claims of discrimination against a particular person because of his or her actual race.

In conclusion, while a consensual interview initiated by the police solely because of the interviewee's race may violate the Equal Protection Clause, in this case the defendant has not met her burden of demonstrating that the detectives initiated a consensual interview with her solely because of her race. Accordingly, we AFFIRM the judgment of the District Court.

BATCHELDER, Circuit Judge, concurring in the result.

While I concur that the motion to suppress was properly denied because the evidence seized arose from a consensual encounter and search, I write separately to dissent from the majority's equal protection analysis. If officers need have no reason whatever to approach citizens for the purpose of engaging in consensual encounters, *see Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991), I continue to be mystified as to how we can require officers who engage in a consensual encounter with someone of a minority race to "produce evidence that contradicts [that individual's] claim that they acted based solely on racial considerations" in engaging in that encounter. Majority opinion at 174. As I indicated in my concurring opinion in *United States v. Jennings,* No. 91–5942, 1993 WL 5927, at *6 (6th Cir. Jan. 13, 1993) (unpublished), to adopt the burden-shifting analysis utilized by the majority is to hold that while a consensual encounter with a non-minority individual requires no basis for suspecting that individual of wrongdoing, a consensual encounter with a member of a minority race must be based on some articulable or particularized suspicion of a non-racial nature. The premise underlying an equal protection claim is that someone acting under color of law has deprived a citizen of a constitutional or statutory right on the basis of a classification into which that citizen fits. There is no constitutional right not to be encountered by law enforcement officers when that encounter is consensual. There can be no deprivation of a right that does not exist. The Fourteenth Amendment analysis in this context is simply not germane.