UNITED STATES of America,
Plaintiff–Appellee,

v.

Cortez AVERY, Defendant–Appellant.

No. 95–5232.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 5, 1995.

Decided Nov. 3, 1997.

Harry P. Hellings, Jr. (argued & briefed), Hellings & Pisacano, Covington, KY, for Defendant–Appellant.

Frederick A. Stine, V, Asst. U.S. Attorney (argued and briefed), Laura K. Voorhees, Asst. U.S. Attorney, Covington, KY, for Plaintiff–Appellee.

Before: KEITH, JONES, and BOGGS, Circuit Judges..

NATHANIEL R. JONES, J., delivered the opinion of the court, in which KEITH, J., joined. BOGGS, J. (p. 358), delivered a separate concurring opinion.

## AMENDED OPINION

NATHANIEL R. JONES, Circuit Judge.

The Defendant entered a conditional plea of guilty in the district court to the charge of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). Pursuant to Federal Rule of Criminal Procedure 11(a)(2), he appeals the district court's denial of his motion to suppress, arguing that cocaine recovered from his carry-on bag should be excluded because (1) airport officers targeted, pursued and interviewed him solely due to his race, in violation of the Equal Protection Clause of the Fourteenth Amendment, and (2) the airport officers seized his bag without reasonable suspicion and thereafter unreasonably detained it, in violation of the Fourth Amendment. We find that although the officers' detention of the Defendant's bag did not violate the Fourth Amendment, and that while the Defendant may have enjoyed Fourteenth Amendment protection, it was not implicated in this case. We therefore affirm.

## I.

On December 16, 1993, agents John Bauerle, Carl Parker and Tim Shaffner of the Cincinnati/Northern Kentucky Airport Narcotics Interdiction Unit were working in Delta Concourse B, monitoring a flight from Los Angeles. Because their observations did not provoke concern, they proceeded toward Concourse A. As they alighted the escalator and walked through the tunnel in the direction of Concourse A, Officer Parker turned to look for another officer who had been with them earlier in the day. At that point, he noticed Defendant Cortez Avery walking hurriedly and stated to his fellow officers, "wait a minute, guys, let this guy get by us." J.A. at 128. Avery, a young African–American male, was wearing sweat pants and a short-sleeve sweatshirt and was carrying a gym-type, carry-on bag. According to Officer Bauerle, Avery appeared very focused and looked straight ahead. Officer Parker stated, "[Avery] looked like a man on a mission." *Id.* The officers decided to follow Avery.

Avery stopped at Gate A–16, went to an empty row of seats facing the windows, and sat in the seat that was closest to the podium and jetway door. Avery appeared anxious to get on the airplane. He tendered his boarding pass to the agent at the podium before a boarding announcement was made and eventually was the first passenger to board the plane. Considering Avery's actions peculiar up to that point, Officer Parker retrieved Avery's boarding pass after Avery boarded and asked the gate agent for ticketing information. She indicated that Avery used a one-way ticket purchased with cash thirty-five minutes prior to departure from San Juan, Puerto Rico, connecting in Orlando and Cincinnati with the final destination of Washington, D.C.[1] The ticket was issued in the name of Antoine Jones.

Armed with this data, Officer Bauerle believed he had "reasonable suspicion" and decided to speak with Avery. J.A. at 132. Two officers, Bauerle and Shaffner, boarded the plane and located Avery in a window seat near the rear of the aircraft. The aisle seat was occupied. From the aisle behind Avery, Officer Bauerle identified himself as a police officer, displayed his badge, and asked Avery if he could speak to him. Avery agreed, and the two stepped into the galley at Bauerle's request. Agent Shaffner stood at the rear of the galley, behind Officer Bauerle, careful not to block Avery's passageway back to his seat or off the plane. At this point, however, the boarding process was not yet completed, and passengers may have impeded Avery's exit from the plane.

Officer Bauerle asked Avery if he could see his ticket, but Avery stated that he had

---

**1.** Actually, because Avery missed his earlier non-stop flight from Orlando to Washington, he had to re-route through Cincinnati.

thrown it away. He asked Avery where he had come from, and Avery responded that he was travelling from Orlando. Bauerle then asked Avery if he had been anywhere prior to Orlando, and Avery stated that he had not. In response to Bauerle's questions concerning the purpose of his visit to Orlando, Avery replied that he had gone to visit friends and was on a mini-vacation by himself. Avery said that he lodged at a hotel but could not remember its name; Avery did not have any receipts for the hotel. He also stated that he did not rent a car while in Orlando. Bauerle then asked the Defendant his name, and he identified himself as Cortez Avery. In response to a request for identification, Avery explained that he had none, but gave his correct date of birth, social security number, and address. With regard to the disparity in names, Avery responded that the airline must have made a mistake when it issued the ticket in the name of Antoine Jones.

Noting the inconsistencies between Avery's statements and the information known to the officers, as well as odd circumstances, such as Avery's lack of identification, Bauerle informed Avery that he was looking for narcotics and asked if he could search Avery's bag. Avery declined the request. Avery, however, consented to a search of his person. Nothing was found. Thereafter, Bauerle informed Avery that he would seize the bag in an attempt to get a warrant, reasoning that due to all the information gathered, he had reasonable suspicion to detain it. J.A. at 137.

Officer Bauerle informed Avery that he was not under arrest and that he was free to leave. Bauerle then told Avery that he had two options: he could remain with the bag or, if Avery would provide an address, he could leave, and the bag would be mailed to him if Bauerle was unable to get a warrant or if there was nothing illegal in it. Avery chose to continue travelling to Washington, D.C., leaving his bag with the officers. The plane departed at approximately 2:35 p.m. and was scheduled to arrive at Washington National Airport at 3:47 p.m.

Upon exiting the aircraft, the officers directed the airport police department to contact Officer Evans, the drug-detecting canine handler. At the airport police station, the officers placed the bag along side several other bags on a table. About 2:55 p.m., twenty-five minutes after leaving the plane with Avery's bag, Officer Evans reported that the dog gave a positive indication of narcotics scent on the bag. The officers then prepared an affidavit for a federal search warrant. The bag was searched pursuant to the warrant, and cocaine was discovered. Thereafter, Cincinnati agents contacted D.C. authorities, and Avery was arrested and detained upon his arrival at Washington National Airport.

A complaint was filed charging Avery with possession with the intent to distribute approximately two kilograms of cocaine. The grand jury issued a one-count indictment on January 12, 1994. On March 1, 1994, Avery moved to suppress the evidence found in his bag, alleging the detectives had violated his right to equal protection guaranteed by the Fourteenth Amendment. Additionally, Avery argued that the detention of his bag was in violation of the Fourth Amendment protection against unreasonable seizure. The district court held an evidentiary hearing on May 11, 1994, after which briefs were submitted.

At the hearing, Officer Bauerle testified that officers are formally taught to look for certain characteristics when identifying people suspected of carrying narcotics. According to Bauerle, prime among those characteristics are: (1) one-way cash tickets purchased shortly before flight time; (2) persons leaving the airplane who do not ask for directions; (3) certain modes of dress; and (4) people who are walking hurriedly through the airport. J.A. at 140. Further, Bauerle testified that although he has never been formally taught to look at race as a characteristic, through informal "networks" with other airports, officers have at times looked for Black or Jamaican gangs using young White females as couriers. Task Force Officer Jim McKiernan also testified that characteristics can change from textbook definitions depending upon trends in the drug-trafficking business and that sometimes race and gender are discussed informally.

At the request of the government, Officer McKiernan and Lieutenant Gayle Blackburn provided statistical data gathered on reported encounters at the airport. This data was not compiled as a matter of course, but was derived from investigative reports. Although Blacks are a minority of the air-travelling public, the relevant data demonstrated that the drug interdiction unit stopped more Blacks than any other group. Notwithstanding, the data did not account for all investigations at the airport, only those the officers choose to report, which Lt. Blackburn "guesstimate[d]" was only 50 percent or less of the total number of persons with whom the task force had contact.

After the hearing and submission of briefs, on October 17, 1994, the magistrate judge issued his Report and Recommendation, recommending denial of Avery's motion. The district court adopted the magistrate judge's Report and Recommendation and issued an Order on November 8, 1994, denying Avery's motion to suppress. Avery entered a conditional plea of guilty on November 16, 1994, and on January 26, 1995, he was sentenced to forty-six months in prison. This appeal followed.

## II.

On appeal, Avery contends that the district court erred in determining that the actions of the police did not violate the Fourteenth Amendment's Equal Protection Clause, and that the district court erred in finding the detention of his bag reasonable under the Fourth Amendment.

■ This court reviews the district court's factual findings in a suppression hearing under the clearly erroneous standard and the district court's conclusions of law *de novo*. *See United States v. Taylor*, 956 F.2d 572, 576 (6th Cir.1992), *cert. denied*, 506 U.S. 952, 113 S.Ct. 404, 121 L.Ed.2d 330 (1992). Further, we review *de novo* the district court's determination as to whether certain facts establish a seizure in violation of the Fourth Amendment. *United States v. Buchanon*, 72 F.3d 1217, 1223 (6th Cir.1995).

"[A]s a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal." *Ornelas v. United States*, 517 U.S. 690, ——, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996).

### A.

We begin by confronting the second argument Avery proffers—that the detention of his bag was an unreasonable seizure in violation of the Fourth Amendment. The Fourth Amendment specifically provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. CONST. amend. IV. It is fundamental to the Constitution that both persons and their possessions are protected not only from unreasonable searches, but also unreasonable seizures. *See United States v. Jacobsen*, 466 U.S. 109, 112–14, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984) ("This text protects two types of expectations, one involving 'searches,' the other 'seizures.' A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property.") (internal footnote omitted). The later protected interest is implicated by an agent's detention of a suitcase. *United States v. Sanders*, 719 F.2d 882, 887 (6th Cir.1983).

■ In this case, the officers' "search" of Avery's bag was accomplished pursuant to a warrant and is not challenged.[2] Further, it is not asserted that Avery himself was seized as a result of the officers' taking of the bag. *But see United States v. Baro*, 15 F.3d 563, 567 n. 1 (6th Cir.) ("Given the particular facts of this case, the seizure of Baro's property under these circumstances was tantamount to a seizure of his person as well.... [The officer] presented Baro with a Hobson's choice: abandon more than $14,000 to a plain-clothed stranger ... or miss his flight, forfeit his plane ticket and remain stranded

---

**2.** A canine sniff of luggage is not a search for Fourth Amendment purposes. *United States v. Lewis*, 708 F.2d 1078, 1080 (6th Cir.1983).

Hence, the search in this case did not occur until after the warrant was issued, when the officers opened the bag.

in a foreign environs."), *cert. denied,* 513 U.S. 912, 115 S.Ct. 285, 130 L.Ed.2d 201 (1994). Avery was not detained; he departed with the plane, en route to Washington. Although Avery does not dispute the validity of the search pursuant to the warrant or claim he was detained, Avery does challenge, as an unconstitutional seizure, the officers' confiscation of his bag in an attempt to obtain a warrant.

"In the ordinary case, the Court has viewed a seizure of personal property as *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." *United States v. Place,* 462 U.S. 696, 701, 103 S.Ct. 2637, 2641, 77 L.Ed.2d 110 (1983). Probable cause, however, can support the detention of property without a warrant, if the exigencies demand it or some other recognized exception to the warrant requirement is present. *Id.* In *Place,* the court applied the *Terry* stop exception to the warrant requirement, permitting seizures of personal luggage from the custody of the owner for the purpose of pursuing a limited course of investigation, based not on probable cause, but upon a reasonable, articulable suspicion, premised on objective facts, that the luggage contains contraband or evidence of a crime. *Id.* at 702, 103 S.Ct. at 2641–42. The Fourth Amendment, therefore, requires officers to have reasonable suspicion of criminal activity to detain temporarily for investigation either an individual or his belongings. *Id.; Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

Although an officer may have reasonable suspicion to detain a person or his possessions for investigation, the officer's investigative detention can mature into an arrest or seizure if it occurs over an unreasonable period of time or under unreasonable circumstances. While the Supreme Court has refused to set an outer time limit on detentions, the Court has held that the passage of time can cause an investigative detention to ripen into a defective seizure that must be based upon probable cause. *Place,* 462 U.S. at 709, 103 S.Ct. at 2645–46; *United*

*States v. Sharpe,* 470 U.S. 675, 685–86, 105 S.Ct. 1568, 1574–76, 84 L.Ed.2d 605 (1985). Officers must diligently pursue a means of investigation likely to confirm or dispel their suspicions quickly. *Sharpe,* 470 U.S. at 686, 105 S.Ct. at 1575–76. Consequently, in order to answer Avery's assignment of error, we focus on the questions of whether the officers had reasonable suspicion at the time they detained Avery's carry-on bag, and whether the circumstances surrounding the detention and the actions after the detention were consistent with an investigative detention, rather than a seizure requiring probable cause.

The government submits that the officers' seizure of Avery's bag was no more than a brief investigative detention, supported by reasonable suspicion. Avery insists that not only did the officers lack reasonable suspicion to detain the bag, but even if they had reasonable suspicion, the time it took to submit the bag to a canine sniff was unreasonable, making the detention tantamount to a seizure for which probable cause was required.

In support of his position, Avery cites *United States v. $53,082.00 in United States Currency,* 985 F.2d 245 (6th Cir.1993). In *$53,082.00,* a civil forfeiture case, this court held that the seizure of the personal property went beyond an investigative detention and was not justified by reasonable, articulable suspicion. Applying *Place,* the court stated that courts must "evaluate individual circumstances and decide whether reasonable articulable suspicions are all that is required to justify the seizure at issue." *Id.* at 249. It then held that the circumstances of the case required more than a reasonable, articulable suspicion. *Id.* The court found that the seizure of cash carried on one's person was a unique circumstance. The court specifically compared the seizure of such a personal effect as cash to the seizure of luggage and implied the seizure of luggage would not enjoy this "special circumstances" approach. *Id.*

Although it held that probable cause was needed to detain the cash, the court ruled that the circumstances of the case did not provide the officers with a reasonable, articulable suspicion, much less probable cause.

The court held that the mere matching of a drug courier profile does not amount to an articulable suspicion; rather, a particularized basis for suspicion must also exist. *Id.* at 249–50. The court also de-emphasized the fact that the defendants made false statements by remarking that such evidence provides only " 'inchoate and unparticularized suspicion ... [not] specific reasonable inferences which [can be drawn] from the facts....' " *Id.* at 250 (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883).

■ While the facts herein bear some resemblance to those in *$53,082.00,* we are not persuaded that in this case the officers had not developed a reasonable, articulable suspicion for the detention. And we believe, no more was needed. The case at bar deals with the detention of luggage, not cash carried on a person. We agree with the distinction highlighted by the court in *$53,082.00,* that "privacy interests in luggage are of a different order than the privacy interests in personal effects carried on the person," creating a higher burden to justify the seizure of cash concealed on one's person. *Id.* at 249 (quoting *United States v. $53,082.00 in United States Currency,* 773 F.Supp. 26, 32 (E.D.Mich.1991)). Such a distinction, of course, does not encourage an across-the-board finding of reasonableness when officers detain luggage, rather than cash. *Cf. Place,* 462 U.S. at 710, 103 S.Ct. at 2646 (detention of luggage unreasonable absent probable cause); *Sanders,* 719 F.2d at 887 ("the investigative detention of Sanders' suitcase was unlawful"); *United States v. Saperstein,* 723 F.2d 1221, 1230 (6th Cir.1983) (amalgam of traits displayed by Saperstein insufficient to justify seizure of person or luggage).

At the point the officers seized the bag in this case, in addition to Avery's actions, which the officers believed to be suspicious, they knew the following: (1) only a brief moment after he boarded the plane, Avery stated he had thrown his ticket away; (2) Avery lied about the origin of his trip, stating it was Orlando, when in fact it was San Juan; (3) Avery misrepresented the nature of his business in Orlando, stating that he was visiting friends on vacation, when in fact Orlando was a stop-over on his way to Washington, D.C.; (4) Avery stated he could not remember the name of his hotel and had no receipts; (5) Avery's ticket was issued in a name different than his own; (6) Avery did not have any identification, although he was travelling from San Juan to Washington; (7) Avery consented to a search of his person, but not his carry-on bag; and (8) Avery was travelling on a cash one-way ticket purchased only thirty-five minutes before departure.

■ While it is true that none of these facts alone is incriminating or illegal, and we are very reluctant to ascribe criminal intent to scenarios that are similar to innocent acts of the general public, we must look at the totality of the circumstances in determining whether or not the detention of the bag was supported by reasonable suspicion. *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981); *see also United States v. Sokolow,* 490 U.S. 1, 9, 109 S.Ct. 1581, 1586–87, 104 L.Ed.2d 1 (1989) (found that factors which are not by themselves proof of any illegal conduct and quite consistent with innocent travel can also have probative significance and taken together can amount to reasonable suspicion). We believe the combined factors in this case provided the officers with sufficient suspicion to hold the bag briefly in order to allow a police dog to sniff it. Accordingly, the district court did not err in finding reasonable suspicion.

■ Avery further contends, however, that the detention of the bag was for a period so long and under circumstances so improper, that it ripened into a *de facto* seizure, requiring probable cause. Avery submits the officers did not have to take his bag; rather, he suggests they should have let him fly to Washington, D.C., with the bag and had the authorities "sniff" it there.

Upon deplaning the aircraft, the officers immediately contacted the airport canine handler and arranged for a meeting at the airport police department with a drug sniffing dog. The entire process from the time the bag was detained to the time it was sniffed took twenty-five minutes. Before leaving the plane, the officers offered Avery the opportunity to accompany his bag or in

the alternative they would return the bag to Avery's Washington address if no drugs were discovered or if they were unable to obtain a warrant. The district court found that under these circumstances the officers performed reasonably. We will not disturb the district court's decision.

Each case such as this must be evaluated on its own facts, viewing the totality of the circumstances. We look to ascertain whether under the established facts, as a matter of law, a seizure occurred, and if so, was it properly supported. Oftentimes, comparison with other cases is helpful, although not necessarily dispositive. *See Illinois v. Gates,* 462 U.S. 213, 238–39 n. 11, 103 S.Ct. 2317, 2332 n. 11, 76. L.Ed.2d 527 (1983) ("one [probable cause] determination will seldom be a useful 'precedent' for another.").[3] In *Place,* a luggage detention case, the court found the detention was unreasonable because there was a ninety minute gap from seizure to sniff, the officers failed to obtain a canine sniffer expeditiously, and the officers did not inform the defendant what they were doing with his luggage. Here, the officers informed Avery what they intended to do with his bag: they quickly obtained a canine to sniff the luggage and did so within twenty-five minutes. Accordingly, a sufficient dis-

tinction exists between the facts in the cases, minimizing the factual value of *Place.* Additionally, as the district court noted, this court has upheld longer investigative detentions. *See United States v. Knox,* 839 F.2d 285 (6th Cir.1988) (thirty minutes), *cert. denied,* 490 U.S. 1019, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989).

The method the officers used in this case was not unreasonable under the circumstances. We have held that officers must use the "least intrusive means readily available," when detaining luggage for investigative purposes. *Sanders,* 719 F.2d at 887. While this remains a valid concept to use in ascertaining the reasonableness of a detention, it was never intended as an absolute and is subject to common sense. *Contra United States v. LaFrance,* 879 F.2d 1, 4–5 (1st Cir.1989) (asserting that *Sanders* went too far in describing the standard in connection with an object detention). As the Court noted in *Sharpe,* it is inappropriate for us to second guess the approach taken by officers, so long as that approach is an appropriate and diligent means of investigation under the circumstances. *Sharpe,* 470 U.S. at 686, 105 S.Ct. at 1575–76.

In the instant case, Avery suggests that the officers should have allowed him to carry

---

**3.** Indeed, we have found on many occasions that similar circumstances either do not provide reasonable suspicion for an officer's detention or demonstrate unreasonable actions on the part of the officers. *See, e.g., United States v. $5000.00 in U.S. Currency,* 40 F.3d 846 (6th Cir.1994) (no probable cause to support forfeiture of money seized at Cleveland Hopkins Airport); *United States v. Obasa,* 15 F.3d 603 (6th Cir.1994) (defendant's seizure on highway after departing Cincinnati/Northern Kentucky Airport not properly supported); *United States v. Baro,* 15 F.3d 563 (6th Cir.1994) (warrantless seizure of cash at Detroit airport held unconstitutional), *cert. denied,* 513 U.S. 912, 115 S.Ct. 285, 130 L.Ed.2d 201 (1994); *United States v. Respress,* 9 F.3d 483 (6th Cir.1993) (probable cause existed to detain luggage at Cincinnati/Northern Kentucky Airport); *United States v. Tillman,* 963 F.2d 137 (6th Cir.1992) (defendant's consent to search bag at Cincinnati/Northern Kentucky Airport invalid); *United States v. Kelly,* 913 F.2d 261 (6th Cir. 1990) (finding initial search illegal and consent to search suitcase at Memphis Airport questionable); *United States v. Clardy,* 819 F.2d 670 (6th Cir.1987) (seizure occurred without reasonable suspicion when police stopped defendant in taxicab outside Cincinnati/Northern Kentucky Air-

port); *United States v. Saperstein,* 723 F.2d 1221 (6th Cir.1983) (defendant and luggage unreasonably seized at Detroit Airport); *United States v. Sanders,* 719 F.2d 882 (6th Cir.1983) (luggage detained for unreasonable period at Memphis Airport and without probable cause held unlawful); *United States v. Jefferson,* 650 F.2d 854 (6th Cir.1981) (search at Detroit Airport illegal when based on vague tip describing suspect as "Black man" and consent for search coerced); *United States v. Wright,* 577 F.2d 378 (6th Cir.1978) (search of suitcase at Detroit Airport was invalid when not supported by warrant or exigent circumstances); *United States v. Craemer,* 555 F.2d 594 (6th Cir.1977) (officers lacking probable cause to search defendant's luggage at Cleveland Hopkins Airport); *United States v. McCaleb,* 552 F.2d 717 (6th Cir.1977) (conviction reversed because officers lacked articulable suspicion and probable cause to search defendant's luggage at Detroit Airport); *United States v. Hunter,* 550 F.2d 1066 (6th Cir.1977) (affirmed district court's suppression of evidence for lack of probable cause to search persons and luggage at Detroit Airport). Such cases, however, all could be distinguished in one way or another from the case at bar, and it would prove a fruitless endeavor to recount the facts of them all.

**352**

his bag to Washington and have a dog ready to sniff it upon his arrival. This may have been a viable alternative approach. Nonetheless, to allow Avery to take the bag with him to Washington, D.C., could have put at risk the integrity of the contents of the bag. Perhaps in hindsight we could contrive a "better" way, but that does not discredit the approach the officers employed herein.

We therefore affirm both the district court's finding that the Fourth Amendment was not violated and the court's decision not to suppress the evidence found in the bag based on the events occurring at the point the bag was detained and thereafter. Nonetheless, Avery further contends that the evidence must be suppressed due to events which occurred prior to the detention of the bag. We turn now to that argument.

**B.**

Avery contests, and the district court discussed, two separate aspects of his initial police encounter: the decision to pursue him and the decision to interview him. We therefore must ascertain whether he is protected independently under the Fourteenth Amendment from either of those police decisions, and, if so, whether the officers in fact acted in violation of the Equal Protection Clause. We find that while he is protected in both instances, the evidence in this case supports pursuit of him independent of his race.

■ Typically, three levels of encounters between police and citizens are challenged in the courts: (1) the consensual encounter, which may be initiated without any objective level of suspicion, *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *United States v. Travis,* 62 F.3d 170 (6th Cir.1995) (hereinafter *"Travis II "*), *cert. denied,* 516 U.S. 1060, 116 S.Ct. 738, 133 L.Ed.2d 688 (1996); (2) the investigative detention, which, if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity, *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *United States v. Respress,* 9 F.3d 483

(6th Cir.1993); and (3) the arrest, valid only if supported by probable cause, *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

■ Investigative detentions and arrests are considered "seizures" and thus must be conducted consistent with the Fourth Amendment principles described above. The consensual encounter, however, is not a seizure and hence not governed by the Fourth Amendment, as long as officer's actions do not convert it into an investigative detention. *Florida v. Bostick,* 501 U.S. 429, 433, 111 S.Ct. 2382, 2385–86, 115 L.Ed.2d 389 (1991). Avery does not challenge his ultimate arrest, nor does he assert that he was subjected to an investigative detention. Consequently, he does not dispute the legality of his encounter with the police under the Fourth Amendment.[4] Instead, Avery offers a Fourteenth Amendment challenge to the officers' actions leading up to his encounter.

■ Although Fourth Amendment principles regarding unreasonable seizures do not apply to consensual encounters, an officer does not have unfettered discretion to conduct an investigatory interview with a citizen. The Equal Protection Clause of the Fourteenth Amendment provides citizens a degree of protection independent of the Fourth Amendment protection against unreasonable searches and seizures. This protection becomes relevant even before a seizure occurs.

■ We first recognized in *United States v. Taylor,* that a "factually supported record of [the selection for interview because of race, a general practice or pattern that primarily targeted minorities for consensual interviews, or a racial component in the drug courier profile] would have given rise to due process and equal protection constitutional implications cognizable by this court." 956 F.2d 572, 578 (6th Cir.), *cert. denied,* 506 U.S. 952, 113 S.Ct. 404, 121 L.Ed.2d 330 (1992). Subsequently, in an unpublished decision, a majority of the court entertained a Fourteenth Amendment challenge to a consensual

---

4. Officer Bauerle's belief that he had "reasonable suspicion" to board the aircraft and speak with Avery is without significance. *See* J.A. at 132. *Regardless of whether such suspicion existed at* that point, at the consensual encounter stage, the "reasonable suspicion" requirement for a Fourth Amendment "seizure" is inapplicable.

encounter, but found insufficient evidence to prove discrimination. *United States v. Jennings*, 985 F.2d 562 (6th Cir.1993) (unpublished) (available at 1993 WL 5927). The court stated, "a law enforcement officer would be acting unconstitutionally were he to approach and consensually interview a person of color solely because of that person's color, absent a compelling justification." *Id.* Adopting the position of the majority in *Jennings*, this court affirmatively held in *Travis II*, that consensual encounters may violate the Equal Protection Clause when initiated solely based on racial considerations. 62 F.3d at 173–74. It is therefore established in this circuit that the Fourteenth Amendment protects citizens from police action, including the decision to interview an airport patron, based solely on impermissible racial considerations.

In this case, Avery argues that a fourth stage in citizen/police interaction is at issue that warrants equal protection consideration. This period, prior to the consensual encounter, when officers decide to "target" someone for surveillance, has been termed the "pre-contact" stage. *See, e.g., United States v. Travis*, 837 F.Supp. 1386, 1391 (E.D.Ky.1993) (hereinafter *"Travis I"*), *aff'd, United States v. Travis*, 62 F.3d 170 (6th Cir.1995). In *Travis I*, the district court aptly described this stage as the point when officers choose whom to look for in the airport in three ways:

(a) by receiving a tip concerning a particular passenger; (b) by scrutinizing the passenger list perhaps followed by obtaining ticket information; or (c) [by] physical or electronic visual surveillance of a traveler.

*Id.* Relying on *United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), the district court found that "the precedents do not establish any constitutional restrictions at the pre-contact level." *Id.* at 1395. This circuit recognized the district court's analysis, stating, "[i]n some instances, officers may decide to interview a suspect for many reasons, some of which are legitimate and some of which may be based on race. *In such instances, . . .* the use of race in pre-contact stage does not give rise to any constitutional protection." *Travis II*, 62 F.3d at 174 (emphasis added).

As noted earlier, an officer's actions during the pre-contact stage cannot give rise to Fourth Amendment constitutional concerns because the citizen has not yet been "seized." The Equal Protection Clause, however, does not contain a seizure requirement. This court has recognized a citizen's right to equal application of the laws at the point when an officer engages in conversation with that citizen. *See Travis II*, 62 F.3d at 174. A citizen's right to equal protection of the laws, however, does not magically materialize when he is approached by the police. Citizens are cloaked at all times with the right to have the laws applied to them in an equal fashion—undeniably, the right not to be exposed to the unfair application of the laws based on their race. In *Mendenhall* the Court found "no question . . . that the respondent possessed [the] constitutional right of personal security [under the Fourth Amendment] as she walked through the Detroit Airport, [because] 'the Fourth Amendment protects people, not places.'" *Mendenhall*, 446 U.S. at 550, 100 S.Ct. at 1875 (quoting *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967)). Similarly, we find that all individuals possess the constitutional right to equal protection as they walk through America's airports.

This court's statement in *Travis II* concerning the pre-contact stage does not affect our holding today. *See supra Travis II*, 62 F.3d at 174. If at the point an officer decides to *interview/encounter* a suspect he has gathered many reasons for that interview—one being race—the focus of the court is the *consensual encounter*, and the use of race as *one* factor in the pre-contact stage may not violate equal protection principles. There are two questions that arise: (1) what of a case in which an officer initially targets someone solely because of his race, without additional factors, and because of the person's race the officer follows and investigates that person for drug trafficking; and (2) what about a situation where an airport police force has a defined policy of targeting only minorities for drug investigation? Such

actions would be constitutionally impermissible, violative of the Equal Protection Clause. A person cannot become the target of a police investigation solely on the basis of skin color.[5] Such selective law enforcement is forbidden.

In reaching this conclusion, we rely both on Fourth and Fourteenth Amendment jurisprudence. The district court has focused on the Supreme Court decisions of *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), and *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), inferring that those Fourth Amendment cases inhibiting the use of race in a *Terry* seizure context, would likewise lead the Court to proscribe the use of race when analyzing certain consensual encounters. J.A. at 99–101; *Travis I,* 837 F.Supp. at 1392. While we find *Brignoni–Ponce* and *Martinez–Fuerte* instructive, just as important to our conclusion are the fundamental tenets of the Fourteenth Amendment. To the extent the Fourth Amendment cases find that the reasonable suspicion requirement for an investigative detention cannot be satisfied when the sole factor grounding the suspicion is race, we agree. *But see Whren v. United States,* 517 U.S. 806, ——, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996) ("[Court's] cases foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved."). Further, we find that such an action would be violative of the Equal Protection Clause of the Fourteenth Amendment. *Id.*(Without reference to "stage" of the investigation, the Court stated, "[w]e of

course agree … that the Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory, application of laws is the Equal Protection Clause, not the Fourth Amendment.").

▮ We recognize the district court's proclamation in *Travis I,* wherein the court stated that *"Brignoni–Ponce* … implies a period of surveillance based on the subject's appearance from which 'reasonable suspicion' justifying a *Terry* stop might arise." *Travis I,* 837 F.Supp. at 1395. Such a period of surveillance could not be challenged under the Fourth Amendment because it does not involve a seizure. The Fourteenth Amendment, however, prohibits agents from engaging in investigative surveillance of an individual based solely on impermissible factors such as race.

Further, the cases the district court relied on in *Travis I* involved border encounters by officers specifically targeting illegal immigrants. Thus, although the Court in *Brignoni–Ponce* stated "the likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor," we refuse to adopt, by analogy, the concept that "the likelihood that any given person of African ancestry is involved in drug trafficking is high enough to make African ancestry a relevant fact" in investigating drug trafficking at the airport. *See Brignoni–Ponce,* 422 U.S. at 886–87, 95 S.Ct. at 2582–83. Indeed, the Court in *Martinez–Fuerte* noted that "[d]ifferent considerations

---

**5.** The court's holding today does not proscribe the use of race when it logically must be employed and does not result in an unfair application of the laws. For example, the pre-contact stage sometimes involves the decision to investigate someone based on a tip from a source outside the police organization (e.g., cab driver, gate agent). In that instance, the officers obviously cannot control the race of the person they investigate and ultimately contact. Hence, their selection of that person as a target of investigation does not amount to an equal protection violation. Nonetheless, if the tipster provides only the person's race as a descriptive characteristic and the officers pursue investigations of everyone of that race, their action may be found constitutionally impermissible.

Another method of selecting persons for investigation is to randomly choose names from a flight list. Again, if the choice of investigatees from the list of names is entirely random, or based on an unusual name (e.g., John Doe), then the choice of the investigatee is not subject to racial considerations, and an equal protection violation is unlikely. If, however, officers only choose to investigate individuals with hispanic or other ethnic surnames, a case could be made for an equal protection violation.

Our holding focuses on the selection of individuals for investigation based on an officer's training and observations or policies of a department to target individuals based on their race. Decisions in these instances are prone to abuse and must be carefully monitored.

would arise if, for example, reliance were put on apparent Mexican ancestry at a checkpoint operated near the Canadian border." *Martinez–Fuerte*, 428 U.S. at 564 n. 17, 96 S.Ct. at 3085 n. 17.

The Fourteenth Amendment guarantee of equal protection does not fit neatly into the various stages of Fourth Amendment search and seizure analysis. This is mainly because the central intention behind the Equal Protection Clause is the prevention of official conduct discriminating on the basis of race. *See Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). The "stage" of investigation is not relevant under a true equal protection analysis. "[T]he heart of the Equal Protection Clause is its prohibition of discriminatory treatment. If a government actor has imposed unequal burdens based upon race, it has violated the clause." *Samaad v. Dallas*, 940 F.2d 925, 932 (5th Cir.1991).

■ Accordingly, we find that citizens are entitled to equal protection of the laws at all times. If law enforcement adopts a policy, employs a practice, or in a given situation takes steps to initiate an investigation of a citizen based solely upon that citizen's race, without more, then a violation of the Equal Protection Clause has occurred. The district court plainly was in error when it found that "there are no constitutional restrictions at the pre-contact level." J.A. at 101 (magistrate judge's Report and Recommendation) (citing *Travis I*, 837 F.Supp. at 1395).

■ We empathize with the district court's concern that "[i]mposing additional restrictions at the pre-contact level would be administratively unwieldy...." *Id.* This concern justifiably stems from the fact that a majority of the contacts reported in this case do not involve situations wherein an officer would have control over the race of an investigatee. As noted in footnote 3 *supra*, in such cases, an equal protection violation could not be proved and thus our recognition of the right to equal protection does not materially affect the responsibilities of law enforcement nor the ability of the courts to define violations. Indeed, a defendant always carries the burden to prove, through conventional methods, that an equal protection violation has occurred.

■ In order "to prevail under the Equal Protection Clause, [a defendant] must prove the decision makers in *his* case acted with discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 292, 107 S.Ct. 1756, 1767, 95 L.Ed.2d 262 (1987); *see also Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985) (selective prosecution claim). In the airport-stop context, "a defendant would have to demonstrate by a 'preponderance of the evidence' that a police officer decided to approach [or pursue] him or her solely because of his or her race." *Travis II*, 62 F.3d at 174.

■ The government has maintained for years, and equally asserts in this case, that it does not use race to select individuals for investigation. Often, it is difficult to prove directly the invidious use of race. In *Washington v. Davis*, the Court stated:

> Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another. It is also not infrequently true that the discriminatory impact—in the jury cases for example, the total of seriously disproportionate exclusion of Negroes from jury venires—may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds.

426 U.S. at 242, 96 S.Ct. at 2048–49. Accordingly, discrimination can be proved through direct evidence, which seldom exists, or inferences can be drawn from valid relevant statistical evidence of disparate impact or other circumstantial evidence. *See Travis II*, 62 F.3d at 174 ("A defendant may put forward evidence suggesting that the consensual interview in his or her particular case was initiated solely because of his or her race. In the absence of other proof, persuasive statistical evidence about a larger population of airport encounters may also create a strong inference that officers chose to engage in a particular consensual interview solely because of the interviewee's race.").

Even when statistical evidence of disparate impact is offered, its role is limited to creation of a rebuttable, prima facie case that race is a motivating factor in the challenged action. *Cf. Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (pattern of preemptory strikes exercised against minorities); *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) (statistical evidence of Hispanics' under-representation as grand jurors). Once a prima facie case is established through statistics or other evidence, the government must articulate a race-neutral reason for its action, or identify a compelling governmental interest in the race-based interviews. The defendant retains the ultimate burden of proving discrimination. Only in rare cases will a statistical pattern of discriminatory impact conclusively demonstrate a constitutional violation. *McCleskey v. Kemp,* 481 U.S. at 293–94 n. 12, 107 S.Ct. at 1767–68 n. 12; *see, e.g., Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) (where altering city boundaries "from a square to an uncouth twenty eight sided figure" excluded three hundred ninety-five or four hundred black voters but not a single white voter); *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (where all but one White applicant, but none of the more than two hundred Chinese applicants, obtained a laundry permit.)

Avery contends that he has statistical evidence from which the district court should have inferred a discriminatory selection of persons, including himself, for drug investigation and consensual encounter. The district court, finding that the Equal Protection Clause did not apply at the pre-contact stage, focused only on the statistics in relation to the consensual encounter. Because the relevant statistical data does not differentiate between the consensual encounter and pre-contact stages, we view the district court's finding that the statistics were insufficient to make out a prima facie case in the same manner as the district court.

Avery relies primarily on statistics provided by the government concerning "1993–1994 Investigative Contacts and Dispatched Runs" to support his claim that he was chosen because of his race. These statistics, although not comprehensive,[6] reveal that in 1993 there were 128 enforcement/investigative contacts. Each case can involve more than one person. Accordingly, of the 128 total cases, 61 cases involved Blacks (totalling 86 people), 40 cases involved Whites (totalling 52 people), 20 cases involved Hispanics (totalling 25 people), and 7 cases involved other/miscellaneous (totalling 10 people). Further, 51.56 percent (66 cases) of these stops were performed "on-view" (rather than outside leads), and of those 66 cases, 35 involved Blacks. Using the limited data available for 1994, the numbers are 35 contacts, 20 cases involving Blacks (totalling 27 people), 42.85 percent (15 cases) "on-view," 11 of which involved Blacks.

Avery asks the court to focus specifically and only on the percentage of the total "on-view" contacts that involve Blacks compared to the estimated percentage of Blacks among the air travelling public. We agree that these numbers are the heart of his statistical argument. The "on-view" cases involve situations in which an officer simply watches passengers in the terminal or passengers deplaning a given flight, and, based on his observations, the officer begins to investigate. "On-view" cases also involve situations wherein the officer obtains a passenger list and looks for passengers connecting from a given flight to certain outbound flights. Although it has been asserted that statistics of the second type of "on-view" cases are not relevant because officers would have no control over the race of a person in the second

---

6. The statistics did not represent all runs or contacts by members of the airport police department or by the airport drug task force. Investigations handled by an officer not associated with the drug task force or investigations wherein the drug task force did not participate do not appear in the calculations. Further, the statistics do not list all of the contacts by the airport task force; they list only those contacts or runs by the task force wherein a report is generated. They do not indicate how many passengers travel through the airport; how many black passengers travel through the airport; how many passengers are contacted, or even investigated; or how many passengers contacted are found not to be involved in drugs and how many of those are black.

type of "on-view" case, we do not agree with that supposition. As noted earlier, if officers focused only on Hispanic or other ethnic surnames in choosing the individuals to investigate, not only would they be able to control the investigated population, they could do it with impermissible criteria.

Approximately 52 percent of all reported cases were "on-view," and slightly more than 53 percent of all "on-view" cases involved Blacks. The defendant did not provide a figure for the total percentage of Blacks among the air-travelling public. He merely stated that Blacks were "a minority" of the air travelling public.[7] Further, we have no information describing how individuals investigated were chosen in the "on-view" cases in which the passenger list was used. If we eliminate those "passenger-list" cases, estimated to account for 50 percent of all "on-view" cases, we are left with only one-fourth of the cases reported. Moreover, Lt. Blackburn's testimony indicated that a large percentage of unreported contacts were those at the pre-contact investigation stage. Thus, the remaining statistics are circumscribed and "skewed in that most of the reports involve individuals actually encountered by the officers and not merely investigated at the pre-contact stage." J.A. at 102 n. 3 (magistrate judge's Report and Recommendation). These statistics simply are not persuasive.

This court has considered similar statistics and stated "they are not a reliable basis for an inference of discrimination." *See Travis II*, 62 F.3d at 175 (reviewing the "1991–1992 incident reports"). In *Travis II*, airport police watched the arrival of a flight from Los Angeles into the Cincinnati/Northern Kentucky Airport. They examined the list of passengers and focused on the name "Angel Chavez" because it seemed "peculiar." They were told the passenger purchased a one-way ticket from Los Angeles to Cleveland five hours before departure from a travel agency in the airport known to provide tickets to drug couriers. They watched passengers

board the plane, but did not see any unaccompanied Hispanic women.

Remembering the destination was Cleveland, a purported "drug distribution city," the officers went to the gate departing to Cleveland to look for any unaccompanied women. The only two were Black. They spoke to both of them and the defendant revealed her name was Angela Travis. She consented to a search and cocaine was found in her purse. Travis used statistics almost identical to those provided by Avery to argue that the consensual encounter was based on race.

The court found that there were many reasons the Defendant was stopped, none attributed to race. Moreover, with respect to the statistics that were presented, the court found them not to be a reliable basis for an inference of discrimination. As mentioned above, Avery offers very similar statistics, although from different years. Consequently, analyzing this case against *Travis*, and recognizing the independent deficiencies in the statistics when applied to the pre-contact stage, we find that the district court was correct in determining that the statistics fell short of proving Avery's prima facie case.

Avery, however, could have also made out his prima facie case with other evidence that the drug task force officers acted with a discriminatory purpose or intent. The district court found that the record did not suggest "that the officers were motivated by any racial consideration in initiating the consensual encounter with Mr. Avery." J.A. at 103. The court focused on the totality of events leading to the consensual encounter and concluded, "Avery cannot show that the decision to consensually encounter him was racially motivated rather than motivated by his actions and flight itinerary." *Id.* at 104. The court's analysis and consideration of the facts, however, was misguided by its erroneous belief that Avery's guarantee of equal protection could not be violated at the "pre-contact" stage.

---

7. In *Travis I* the court noted that airplane passengers nationwide are estimated at 88% white, 5% African American, and 1% Hispanic. Assuming a similar makeup existed in Cincinnati during 1993–94, the statistics at a minimum indicate a disparity in the ratio of Black travellers to Black persons reported stopped at the airport. Nonetheless, the statistics are still lacking.

The court should have considered only the facts that led the officers to begin their investigation of Avery. When the officers began to follow Avery they knew: (1) he was in a hurry; (2) he appeared focused and looked straight ahead; (3) he was attired in a sweat suit with short sleeves in December; and (4) he carried a gym-type, carry-on bag. These factors, when combined with the observation at the gate of Avery sitting in an empty row of seats closest to the podium, provided the officers with sufficient reason to begin an investigation of Avery. An officer is not held to a "suspicion of criminal activity standard" when he embarks to investigate someone. The officer merely is prohibited from his pursuit if he acts based solely on race. Consequently, there was no equal protection violation in this case.

### III.

Based on the foregoing, we **AFFIRM.**

BOGGS, Circuit Judge, concurring.

I concur in the judgment of the court, and I concur completely in the court's analysis in Parts I and II A. The court's *holding* with respect to Part II B is, based on a careful analysis of the evidence, that "there was no equal protection violation in this case." *Supra*, at 357. I agree. I write separately only to note that I believe that much of the language in Part II B goes well beyond what is necessary to reach that conclusion, and thus is dicta. Moreover, this case is a good illustration of the desirability of a court restricting its discussion to what is necessary to decide the case at hand, especially in an area where the factual situations that might be covered by the court's broad language are likely to be varied and subtle.

I fully agree that, as stated in *Travis II,* the initiation of consensual contacts based solely on race can violate the Equal Protection Clause. However, the question that would be presented here, if there were not good evidence of non-racial motivations for the officers' actions, is a more difficult one.

On the one hand, even if a hypothetical defendant were to present compelling evidence that officers "noticed" (*supra*, at 346) or "targeted" (*supra*, at 352) or "pursued" (*supra*, at 355) or "investigated" (*supra*, at 353) a person solely because of his race, would suppression be the proper remedy, when the "pre-contact" activity that could be described by those words leads to evidence of crime? I am not sure of the answer to that question. Although the court hypothesizes that equal protection violations could occur at the pre-contact stage (and the court's language is notably hypothetical—"what of a case"; "what about a situation" (*ibid.*); "a case could be made"; "may be found" (*supra,* note 5)), the court never discusses whether such violations could result in the suppression of evidence otherwise lawfully obtained.

On the other hand, the contours of the violation are difficult to discern in the abstract. In a paradigmatic case, an officer on routine foot patrol walks east on First Street, behind two men, one black and one white. First Street dead-ends into Main, so at the corner of First and Main each man, and the officer, must turn right or left. The black man turns one way; the white man turns the other. The officer chooses to turn the corner to follow one of the men and, when questioned later, candidly admits that he had no reason for deciding to go right rather than left save the race of the man who also turned that way. However, within a block of turning the corner, the officer sees the man rob a store, and arrests the man. My intuition is that the evidence of that robbery could not be suppressed. However, that intuition is no less dicta than most of the discussion in Part II B of the court's opinion.

I would have preferred that we wait for a case whose facts would provide context for our consideration, leaving until that day the question of the circumstances in which "pre-contact" actions, whether denominated as "pursuit," "investigation," or "targeting", (or, as I think most accurate here, merely "noticing") could possibly violate the equal protection guarantee. We know that in *this* case, the officers' actions did not, and I think that is sufficient for today.