[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
Oct. 22, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-12967

_____

D. C. Docket No.07-00017-CR-ORL-28DAB

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JORGE ANTONIO QUINTANA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(October 22, 2009)

Before CARNES, FAY and ALARCÓN,[*] Circuit Judges.

ALARCÓN, Circuit Judge:

_____

[*]Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting
by designation.

Jorge Antonio Quintana, an alien, has appealed from judgment of conviction. Pursuant to a plea agreement, Mr. Quintana entered a conditional guilty plea, to the crime of entering the United States without the express consent of the Attorney General of the United States, or the Secretary of the Department of Homeland Security to enter the United States, after he had been previously removed from the United States after entering this country illegally in violation of 8 U.S.C. § 1326(a) and § 1326(b)(2).

In the plea agreement, Mr. Quintana reserved the right to file an appeal on the ground that his right to equal protection under the Fourteenth Amendment was violated because the sole reason the arresting officers initiated a consensual encounter with him in a public place was their belief that he appeared to be of Middle Eastern ethnicity.[1] The district court denied his motions to suppress the evidence and to dismiss the indictment

In denying Mr. Quintana's dismissal motion, the district court held that if Mr. Quintana was stopped "solely because the officers believed he was Middle Eastern Pakistani or Muslim . . . the officers may have acted unconstitutionally in violation of the Equal Protection Clause of the Fourteenth Amendment."

---

[1]Quintana concedes in his opening brief that "[t]his case involves a consensual encounter." (Br. of Appellant 6). He also asserts that he was not subjected to an investigative detention without reasonable suspicion, or an arrest without probable cause in violation of the Fourth Amendment. *Id.*

However, the district court found that "[t]he facts in this case . . . do not support a conclusion that . . . Mr. Quintana's ethnicity or religion was the only basis for initiating the encounter . . . ." Mr. Quintana has challenged that finding in this appeal.[2] We affirm the judgment because we conclude that the district court's findings were not clearly erroneous. It did not abuse its discretion in denying the motion to dismiss the indictment.

## I

## A

In summarizing the facts, we are mindful that we must review the record in the light most favorable to the prevailing party. *See United States v. Miles*, 290 F.3d 1341, 1355 (11th Cir. 2002) ("In determining a sufficiency of the evidence claim, we view the evidence in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor.").

At the evidentiary hearing conducted to resolve Mr. Quintana's suppression and dismissal motions, the Government conceded that Mr. Quintana's "apparent race" was one of the factors for law enforcement's initial encounter with him, "but

---

[2]Mr. Quintana abandoned his motion to suppress the statements he made after he was encountered by Officer Shanley because the Government informed the district court that it did not intend to introduce any of Mr. Quintana's statements against him at trial. Thus, the only issue on appeal is whether the district court erred in denying the motion to dismiss the indictment.

3

it was not the only reason that he was encountered." Detective Roberto Romero Tello, a member of the Orlando Police Department's intelligence unit concentrating on monitoring subversive groups including domestic and international terrorists, testified that Mr. Quintana first came to his attention when he saw him downtown "just meandering, loitering near the intersection, not really going anywhere, just hanging out." Detective Tello noticed that Mr. Quintana was standing around "[n]ever going into a club or going somewhere to and fro as most people do."

Approximately two months later, Detective Tello pointed out Mr. Quintana to Detective Richard Ruth when they were working the same detail. Mr. Quintana was in downtown Orlando off of north Orange Avenue, near the intersection of Central. Detective Tello testified that after pointing out Mr. Quintana to Detective Ruth, he told him to watch Mr. Quintana's behavior when he was approached by Detective Tello. Detective Tello testified that as he walked towards Mr. Quintana, "when he noticed my presence, he took off, took flight" and disappeared "at a high rate of speed just below a run."

Detective Tello testified that, in his experience, this conduct was "[a]typical behavior for downtown people. Usually people are going to a club, going in or out, going to their car, stopping at a hot dog stand, hanging around." He testified

4

that he has worked in the area for sixteen years and knows the transients who occasionally do just hang around or beg. Detective Tello stated that Mr. Quintana's conduct appeared unusual because, in his experience, he is observant and generally talks to everybody, and has "never had people take flight unless, [ . . . ] there was a valid reason for doing so."

Detective Tello and Detective Ruth observed Mr. Quintana several times in the same vicinity prior to January 16, 2007. On that date, Mr. Quintana appeared with a video camera across the street from the Firestone Club, a hip-hop nightclub. Detective Tello testified that he concluded that Mr. Quintana should be encountered because he was videotaping the nightclub. Detective Tello testified he was concerned that "there might be an attack on the building" because, to extremists, nightclubs represent "American economic prosperity" and "American debauchery." Detective Tello stated he would have wanted to contact Mr. Quintana "[g]iven any ethnicity . . . based upon the long period fleeing and now showing up at the club with a video camera and not wanting to go in and taking flight from seeing us."

When Mr. Quintana noticed the uniformed officers, he "started walking away real fast." Rather than chase him, Detective Tello "walked away as though [he] wasn't going to go after [Mr. Quintana]." At that time, Detective Ruth asked

5

Officer Brian Christopher Shanley, who was assigned to a bike unit, to conduct a Field Incident Report.

Detective Ruth corroborated Detective Tello's testimony. Detective Ruth stated that he was assigned to the Orlando Police Department's intelligence unit. He requested Officer Shanley to conduct a Field Incident Report based on information he received from Detective Tello, and his observations of Mr. Quintana over the prior three weeks. Detective Ruth testified that if the officers "showed him any attention, [he] would dip into the crowd and begin to evade and actually kind of almost run away from us."

Detective Ruth testified that he did not ask Officer Shanley to initiate a consensual encounter with Mr. Quintana "just because he looked Middle Eastern." He stated that it was "[b]ecause I had seen him numerous occasions outside of clubs, never going into the clubs, with a video camera, and evading police attention."

Detective Ruth testified that he approached Mr. Quintana after he was detained and looked at his driver's license. When he saw the name Jorge Quintana, Detective Ruth laughed and told him that he was expecting a Middle Eastern name. The following day, Detective Ruth interrogated Mr. Quintana to determine whether he was of Mexican nationality, or a Middle Easterner posing as a Mexican.

6

Detective Ruth was accompanied by Special Agent Johnson of the Immigration and Customs Enforcement Agency because he believed he would be able to determine whether Mr. Quintana was a Mexican or a Middle Easterner.

Detective Ruth testified that he would have requested a field investigation interview of a person with blonde hair or blue eyes if he or she had engaged in the same conduct that he observed on January 16, 2007, i.e., use of a video camera to photograph the outside of the Firestone Club and evasive activities over the prior three weeks when approached by a police officer.

Officer Shanley testified that he was attached to a downtown bike unit of the Orlando Police Department on January 16, 2007. Pursuant to Detective Ruth's request, he asked Mr. Quintana if he could talk to him. Mr. Quintana turned around and said "Yes." In response to Officer Shanley's request, Mr. Quintana produced a driver's license. Officer Shanley used a police teletype channel to determine whether Mr. Quintana was wanted on any outstanding warrants. Officer Stanley was informed that there was a warrant for Mr. Quintana's arrest. When he received confirmation that the warrant was still outstanding, Officer Shanley placed Mr. Quintana under arrest.

**B**

Mr. Quintana did not testify at the hearing on his suppression and dismissal

7

motions. In its order denying his motion to dismiss the indictment, the district court found as follows:

> The facts in this case, . . . do not support a conclusion that law enforcement's mistaken understanding of Mr. Quintana's ethnicity or religion was the only basis for initiating the encounter, though admittedly it played a role. The officers' prior observations of Mr. Quintana considered with the observations from the night in question form a sufficient constitutional basis for law enforcement initiating contact with Mr. Quintana. This would have been the case based on Mr. Quintana's conduct even in the absence of the officer's erroneous beliefs regarding Mr. Quintana's religion and ethnicity.

Mr. Quintana's has timely appealed the district court's order denying his motion to dismiss the indictment. The district court had subject matter jurisdiction over this criminal matter pursuant to 18 U.S.C. § 3231. We have jurisdiction over this appeal under 18 U.S.C. § 3742 and 18 U.S.C. § 1291.

## II

The district court denied the motion to dismiss the indictment because it concluded that Quintana failed to demonstrate that the sole reason for the consensual encounter was his apparent race or ethnicity.

Mr. Quintana states in his opening brief that "the only question in this case is whether the consensual encounter between Mr. Quintana was initiated solely by racial considerations." (Br. of Appellant 11). He argues that "the district court did

8

not cite a single reason for the consensual encounter separate from Mr. Quintana's supposed ethnicity." *Id.* at 12. This contention is not supported by any citation to the record. Mr. Quintana also maintains that "[t]he evidence at the hearing on the motion showed that law enforcement would not have tried to talk to Mr. Quintana absent the officers' mistaken belief that he was "Middle Eastern or Muslim." *Id.* This Court reviews the denial of a motion to dismiss an indictment for abuse of discretion. *United States v. Pendergraft*, 297 F.3d 1198, 1204 (11th Cir. 2002). In determining whether a district court has abused its discretion, we must review issues of law *de novo*. *United States v. Robinson*, 505 F.3d 1208, 1225 n.24 (11th Cir. 2007). We must review findings of fact for clear error. *United States v. Trainer*, 376 F.3d 1325, 1329-30 (11th Cir. 2004).

Relying on the Sixth Circuit's opinion in *United States v. Avery*, 137 F.3d 343 (6th Cir. 1997), the district court concluded that a consensual encounter initiated solely because of a person's racial or ethnic appearance may violate the Fourteenth Amendment. In *Avery*, the appellant, a young African-American claimed that his initial consensual encounter with the police was based solely on his racial appearance. *Id.* at 346. The Sixth Circuit held that the arrest of a person solely because of his racial appearance is a violation of the Fourteenth Amendment. It reasoned as follows:

9

> [W]e find that citizens are entitled to equal protection of the laws at all times. If law enforcement adopts a policy, employs a practice, or in a given situation takes steps to initiate an investigation of a citizen based solely upon that citizen's race, without more, then a violation of the Equal Protection Clause has occurred.

*Id.* at 355.

The Sixth Circuit affirmed the conviction in *Avery*, however, because "the evidence in this case supports pursuit of him independent of his race." *Id.* at 352. In reaching this conclusion, the Sixth Circuit relied upon the following principle set forth in *Samuels v. Dallas*, 940 F.2d 925 (5th Cir. 1991): "The heart of the Equal Protection clause is its prohibition of discriminatory treatment. If a governmental actor has imposed unequal burdens based on race, it has violated the clause." *Id.* at 932.

### III

In the district court's order denying the motions to suppress and dismiss, it summarized the testimony of Detective Tello and Detective Ruth as follows:

> During the evidentiary hearing, Officers Richard Ruth and Roberto Tell[o] testified and described their observations of Mr. Quintana.[3] They both testified that,
>
> [3]For the most part, the testimony of Officer Ruth and Officer Tell[o] is consistent with regard to their prior sightings of Mr. Quintana, The officers were often together when these sightings occurred. The testimony is, however, irreconcilable pertaining to one important detail. Officer Ruth testified that when he saw Mr.

10

Quintana outside nightclubs, he always had a camera and was engaged in the filming of the entrances to the clubs. Officer Tell[o], on the other hand, testified that he had never seen Mr. Quintana with a camera before January 16, 2007. For the purpose at hand, I accept Officer Tell[o]'s version of the facts.

 while working together, they had seen Mr. Quintana many times prior to his arrest on January 16, 2007. On each occasion, Mr. Quintana was in downtown Orlando outside various nightclubs. The officers never saw Mr. Quintana enter the nightclubs or stand in line to do so; he was always on the sidewalk observing. Both officers testified that when Mr. Quintana observed them approaching, he would invariably leave. Mr. Quintana is slightly built, dark complected, and he wears a beard. Because of his appearance, the officers thought he was "Muslim," "a Middle Easterner," or "Pakistani." In fact, he is from Mexico.

Officers Ruth and Tell[o] again saw Mr. Quintana on January 16, 2007 outside the Firestone Club. On this occasion Mr. Quintana was filming the entrance of the club. Upon observing Mr. Quintana, Officer Ruth directed a subordinate officer to do a "field investigation report." Complying, the subordinate officer approached Mr. Quintana and asked if he could see identification. Mr. Quintana produced identification and the officer forwarded the information by radio. The officer was then advised by return communication that there was a warrant for Mr. Quintana's arrest, prompting the officer to order Mr. Quintana to sit on the sidewalk. Other officers came to the scene including Officer Ruth who was surprised to learn that Mr. Quintana was Mexican, stating that he had believed him to be Pakistani. Mr. Quintana was then arrested and taken into custody. Still uncertain about Mr. Quintana's religion and ethnicity, Officer Ruth later went to the jail to question Mr. Quintana's about any connection he might have with Islam.

11

Based on the officers' testimony, which the district court found credible, it concluded that while Mr. Quintana's apparent ethnicity played a role in the encounter, the facts do not support a finding that it was the sole basis for initiating the encounter. Prior observations of Mr. Quintana by law enforcement, "considered with the observations from the night in question form a sufficient constitutional basis for law enforcement initiating contact with Mr. Quintana."

In the reply brief, Mr. Quintana's counsel argues that "[h]ad they not decided that Mr. Quintana was 'Middle Eastern,' the law enforcement officers would not have even approached him." This argument is contrary to Detective Tello's testimony.

Detective Tello was asked the following question at the evidentiary hearing: "Would you have wanted to contact him if he had blonde hair and blue eyes, given his course of conduct?" Detective Tello replied: "Given any ethnicity I would have wanted to contact him based upon the long period fleeing and now showing up at the club with a video camera and not wanting to go in and taking flight upon seeing us." The district court credited this testimony.

The question whether the Equal Protection Clause is violated where the sole reason to initiate a consensual police encounter based on race or ethnicity is a novel question not previously addressed by this Court. We need not decide that

issue in this matter because the record shows that the consensual encounter in this matter was not based on Mr. Quintana's apparent race or ethnicity.

Mr. Quintana has failed to demonstrate that the district court abused its discretion in denying his motion to dismiss the indictment. The district court did not clearly err in its finding that Mr. Quintana's apparent race or ethnicity was not the sole factor relied upon by Detective Ruth in directing Officer Stanley to initiate a consensual encounter.

**IV**

For the first time in its responsive brief, the Government asserted that dismissal of an indictment is not the appropriate remedy if the record shows that a person's apparent race or ethnicity is the sole reason for a consensual encounter. The Government did not raise this novel question before the district court. It has also failed to cite any decision that directly supports this proposition. During oral argument, counsel for the Government stated that this Court need not reach the question whether dismissal of an indictment is an appropriate remedy for a violation of the Equal Protection Clause of the Fourteenth Amendment. Because we are persuaded that Mr. Quintana has not met his burden of demonstrating a violation of the Fourteenth Amendment, we decline to consider the question whether dismissal of an indictment is an appropriate remedy where the evidence

13

demonstrates a violation of the Equal Protection Clause.

## Conclusion

The undisputed evidence shows that Detectives Tello and Ruth mistakenly concluded that Mr. Quintana was a Middle Easterner weeks prior to January 16, 2007. They decided to initiate a consensual encounter on that date after they observed him photographing the Firestone Club. They decided to do so based on their knowledge that international terrorists have blown up nightclubs because they represent American debauchery. In *United States v. Cortez*, 449 U.S. 411 (1981), the Supreme Court instructed that "a trained officer draws inferences and makes deductions–inferences and deductions–that might elude an untrained person." *Id.* at 418. We are persuaded that the totality of the circumstances known to the officers were sufficient to justify a consensual encounter to determine Mr. Quintana's identity in order to decide whether further investigation might reveal that he was engaged in subversive or terrorist activities.

The circumstantial evidence in this record clearly supports an inference that Mr. Quintana's apparent race or ethnicity was not the sole factor in triggering the consensual encounter. The evidence credited by the district court, viewed in the light most favorable to the Government, supports its finding that Mr. Quintana was not subjected to a violation of his right to equal protection. The district court did

not abuse its discretion in denying Mr. Quintana's motion to dismiss the indictment.

  **AFFIRMED**.